## NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
### *v.* SMITH

No. 98–84. Argued January 20, 1999—Decided February 23, 1999

460

*John G. Roberts, Jr.,* argued the cause for petitioner. With him on the briefs were *Martin Michaelson, Gregory G. Garre, John J. Kitchin, Robert W. McKinley,* and *Elsa Kircher Cole.*

*Carter G. Phillips* argued the cause for respondent. With him on the brief was *Virginia A. Seitz.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, Irving L. Gornstein,* and *Dennis J. Dimsey.** 

---

*Richard O. Duvall, Robin L. Rosenberg, David A. Vaughan,* and *Sheldon Elliot Steinbach* filed a brief for the American Council on Education et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for Michael Bowers et al. by *Barbara E. Ransom;* for Trial Lawyers for Public Justice, P. C., et al. by *Adele P. Kimmel, Arthur H. Bryant,* and *J. Richard Cohen;* and for the National Women's Law Center et al. by *Marcia D. Greenberger, Leslie T. Annexstein, Lois G. Williams,* and *Dina R. Lassow.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the amenability of the National Collegiate Athletic Association (NCAA or Association) to a private action under Title IX of the Education Amendments of 1972. The NCAA is an unincorporated association of approximately 1,200 members, including virtually all public and private universities and four-year colleges conducting major athletic programs in the United States; the Association serves to maintain intercollegiate athletics as an integral part of its members' educational programs. Title IX proscribes sex discrimination in "any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a).

The complainant in this case, Renee M. Smith, sued the NCAA under Title IX alleging that the Association discriminated against her on the basis of her sex by denying her permission to play intercollegiate volleyball at federally assisted institutions. Reversing the District Court's refusal to allow Smith to amend her *pro se* complaint, the Court of Appeals for the Third Circuit held that the NCAA's receipt of dues from federally funded member institutions would suffice to bring the Association within the scope of Title IX. We reject that determination as inconsistent with the governing statute, regulation, and Court decisions. Dues payments from recipients of federal funds, we hold, do not suffice to render the dues recipient subject to Title IX. We do not address alternative grounds, urged by respondent and the United States as *amicus curiae*, in support of Title IX's application to the NCAA in this litigation, and leave resolution of those grounds to the courts below on remand.

I

Rules adopted by the NCAA govern the intercollegiate athletics programs of its member colleges and universities; "[b]y joining the NCAA, each member agrees to abide by

and enforce [the Association's] rules." *National Collegiate Athletic Assn.* v. *Tarkanian,* 488 U. S. 179, 183 (1988); see 1993–1994 NCAA Manual, NCAA Const., Arts. 1.2(h), 1.3.2, p. 1. Among these rules is the Postbaccalaureate Bylaw, which allows a postgraduate student-athlete to participate in intercollegiate athletics only at the institution that awarded her undergraduate degree. See *id.*, Bylaw 14.1.8.2, at 123.[1]

Respondent Smith enrolled as an undergraduate at St. Bonaventure University, an NCAA member, in 1991. Smith joined the St. Bonaventure intercollegiate volleyball team in the fall of 1991 and remained on the team throughout the 1991–1992 and 1992–1993 athletic seasons. She elected not to play the following year.

Smith graduated from St. Bonaventure in 2½ years. During the 1994–1995 athletic year, she was enrolled in a postgraduate program at Hofstra University; for the 1995–1996 athletic year, she enrolled in a different postgraduate program at the University of Pittsburgh. Smith sought to play intercollegiate volleyball during these athletic years, but the NCAA denied her eligibility on the basis of its postbaccalau-

---

[1] The Postbaccalaureate Bylaw is an exception to the general NCAA rule restricting participation in intercollegiate athletics to students enrolled in a full-time program of studies leading to a baccalaureate degree. See 1993–1994 NCAA Manual, Bylaw 14.1.8.1, at 123. In full, the Postbaccalaureate Bylaw provides:

"A student-athlete who is enrolled in a graduate or professional school of the institution he or she previously attended as an undergraduate (regardless of whether the individual has received a United States baccalaureate degree or its equivalent), a student-athlete who is enrolled and seeking a second baccalaureate or equivalent degree at the same institution, or a student-athlete who has graduated and is continuing as a full-time student at the same institution while taking course work that would lead to the equivalent of another major or degree as defined and documented by the institution, may participate in intercollegiate athletics, provided the student has eligibility remaining and such participation occurs within the applicable five-year or 10-semester period set forth in 14.2." Bylaw 14.1.8.2.

reate restrictions.    At Smith's request, Hofstra and the University of Pittsburgh petitioned the NCAA to waive the restrictions.    Each time, the NCAA refused to grant a waiver.

In August 1996, Smith filed this lawsuit *pro se,* alleging, among other things, that the NCAA's refusal to waive the Postbaccalaureate Bylaw excluded her from participating in intercollegiate athletics at Hofstra and the University of Pittsburgh on the basis of her sex, in violation of Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. § 1681 *et seq.*[2]   The complaint did not attack the Bylaw on its face, but instead alleged that the NCAA discriminates on the basis of sex by granting more waivers from eligibility restrictions to male than female postgraduate student-athletes.    Complaint ¶ 26, Joint App. in Nos. 97–3346 and 97–3347 (CA3), p. 4 (hereinafter Joint App.); Amended Complaint ¶ 64, Joint App. 98.

The NCAA moved to dismiss Smith's Title IX claim on the ground that the complaint failed to allege that the NCAA is a recipient of federal financial assistance.    In opposition, Smith argued that the NCAA governs the federally funded intercollegiate athletics programs of its members, that these programs are educational, and that the NCAA benefited economically from its members' receipt of federal funds.    See Joint App. 55–56.

Concluding that the alleged connections between the NCAA and federal financial assistance to member institutions were "too far attenuated" to sustain a Title IX claim, the District Court dismissed the suit.    978 F. Supp. 213, 219, 220 (WD Pa. 1997).    Smith then moved the District Court for leave to amend her complaint to add Hofstra and the Uni-

---

[2] The complaint also stated a Sherman Act claim and a state contract law claim.    The District Court dismissed the Sherman Act claim, 978 F. Supp. 213, 218 (WD Pa. 1997), and declined to retain supplemental jurisdiction over the state claim, *id.,* at 220.    The Court of Appeals affirmed the dismissal of the Sherman Act claim, 139 F. 3d 180, 187 (CA3 1998), and this Court denied certiorari on that issue, see 524 U. S. 982 (1998).

versity of Pittsburgh as defendants, see Amended Complaint ¶ 63, Joint App. 97, and to allege that the NCAA "receives federal financial assistance through another recipient and operates an educational program or activity which receives or benefits from such assistance," *id.*, ¶ 65, Joint App. 98. The District Court denied the motion "as moot, the court having granted [the NCAA's] motion to dismiss." App. to Pet. for Cert. 36a.

The Court of Appeals for the Third Circuit reversed the District Court's refusal to grant leave to amend the complaint. 139 F. 3d 180, 190 (1998). The Third Circuit agreed with the District Court that Smith's original complaint failed to state a Title IX claim. *Id.*, at 189. But Smith's proposed amended complaint, the Court of Appeals said, "plainly alleges that the NCAA receives dues from member institutions, which receive federal funds." *Id.*, at 190. That allegation, the Third Circuit held, "would be sufficient to bring the NCAA within the scope of Title IX as a recipient of federal funds and would survive a motion to dismiss." *Ibid.* Under the Third Circuit's ruling, all Smith would need to prove on remand to proceed is that the NCAA receives members' dues, a fact not in dispute.

The NCAA petitioned for this Court's review, alleging that the Court of Appeals' decision conflicted with *Department of Transp.* v. *Paralyzed Veterans of America*, 477 U. S. 597 (1986). Pet. for Cert. 7–15. We granted certiorari, 524 U. S. 982 (1998), to decide whether a private organization that does not receive federal financial assistance is subject to Title IX because it receives payments from entities that do.

## II

Section 901(a) of Title IX of the Education Amendments of 1972, 20 U. S. C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."[3] Under the Civil
Rights Restoration Act of 1987 (CRRA), 102 Stat. 28, 20
U. S. C. § 1687, a "program or activity" includes "all of the
operations of . . . a college, university, or other postsecondary
institution, or a public system of higher education . . . any
part of which is extended Federal financial assistance."
§ 1687(2)(A). The CRRA also provides institution-wide cov-
erage for entities "principally engaged in the business of pro-
viding education" services, § 1687(3)(A)(ii), and for entities
created by two or more covered entities, § 1687(4).[4] Thus, if
any part of the NCAA received federal assistance, all NCAA
operations would be subject to Title IX.

We have twice before considered when an entity qualifies
as a recipient of federal financial assistance. In *Grove City
College* v. *Bell*, 465 U. S. 555, 563–570 (1984), we held that a
college receives federal financial assistance when it enrolls
students who receive federal funds earmarked for educa-
tional expenses. Finding "no hint" that Title IX distin-
guishes "between direct institutional assistance and aid re-
ceived by a school through its students," we concluded that
Title IX "encompass[es] *all* forms of federal aid to education,

---

[3] The scope of several other federal antidiscrimination measures is de-
fined in nearly identical terms. See § 601 of Title VI of the Civil Rights
Act of 1964, 42 U. S. C. § 2000d (prohibiting race discrimination in "any
program or activity receiving Federal financial assistance"); § 504 of the
Rehabilitation Act of 1973, 29 U. S. C. § 794(a) (prohibiting discrimination
on the basis of disability in "any program or activity receiving Federal
financial assistance"); and § 303 of the Age Discrimination Act of 1975, 42
U. S. C. § 6102 (prohibiting discrimination on the basis of age in "any pro-
gram or activity receiving Federal financial assistance").

[4] Congress enacted the CRRA in response to Part III of our decision in
*Grove City College* v. *Bell*, 465 U. S. 555, 570–574 (1984), which concluded
that Title IX, as originally enacted, covered only the specific program
receiving federal funding. See *Franklin* v. *Gwinnett County Public
Schools*, 503 U. S. 60, 73 (1992) (noting that Congress endeavored, in the
CRRA, "to correct what it considered to be an unacceptable decision on
our part in *Grove City*").

direct or indirect." *Id.*, at 564 (internal quotation marks omitted).

In *Paralyzed Veterans*, 477 U. S., at 603–612, we considered the scope of §504 of the Rehabilitation Act of 1973, 29 U. S. C. §794, which prohibits discrimination on the basis of disability in substantially the same terms that Title IX uses to prohibit sex discrimination. In that case, a group representing disabled veterans contended that the Department of Transportation had authority to enforce §504 against commercial air carriers by virtue of the Government's extensive program of financial assistance to airports. We held that airlines are not recipients of federal funds received by airport operators for airport construction projects, even when the funds are used for projects especially beneficial to the airlines. Application of §504 to all who benefited economically from federal assistance, we observed, would yield almost "limitless coverage." 477 U. S., at 608. We concluded that "[t]he statute covers those who receive the aid, but does not extend as far as those who benefit from it." *Id.*, at 607.[5]

The Court of Appeals determined "not [to] apply the *Paralyzed Veterans* Court's definition of 'recipient' to Title IX," 139 F. 3d, at 189, finding that definition inconsistent with 34 CFR §106.2 (1997), a Title IX regulation issued by the

---

[5] Smith suggests that *Paralyzed Veterans* does not control the question presented here because that case involved a Government enforcement action while this is a private suit. This argument hinges on Smith's position that the private right of action available under 20 U. S. C. §1681(a) is potentially broader than the Government's enforcement authority provided by §1682. We reject this position. There is no express authorization for private lawsuits in Title IX; in *Cannon* v. *University of Chicago*, 441 U. S. 677, 717 (1979), we concluded that Congress had intended to authorize a private right of action even though it failed to do so expressly. We think it would be anomalous to assume that Congress intended the implied private right of action to proscribe conduct that Government enforcement may not check. See 20 U. S. C. §1682 (authorizing federal administrative enforcement by terminating the federal funding of any noncomplying recipient, §1682(1), or "by any other means authorized by law," §1682(2)).

Department of Education. The Third Circuit interpreted the Department's regulation to define a "recipient" as "an entity 'which operates an educational program or activity which *receives or benefits*' from federal funds." 139 F. 3d, at 189 (quoting § 106.2(h)). The court reasoned that § 106.2(h) extends Title IX to beneficiaries of federal funding as well as recipients. Applying the more limited rule of *Paralyzed Veterans*, the appeals court concluded, would "render the regulatory definition of 'recipient' under Title IX a nullity." *Ibid.*

The Third Circuit's reading of § 106.2(h) failed to give effect to the regulation in its entirety. Section 106.2(h) defines "recipient" to include any entity "to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance." The first part of this definition makes clear that Title IX coverage is not triggered when an entity merely benefits from federal funding. Thus, the regulation accords with the teaching of *Grove City* and *Paralyzed Veterans:* Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not.

The Third Circuit's conclusion that the NCAA would be subject to the requirements of Title IX if it received dues from its federally funded members is inconsistent with this precedent. Unlike the earmarked student aid in *Grove City*, there is no allegation that NCAA members paid their dues with federal funds earmarked for that purpose. At most, the Association's receipt of dues demonstrates that it indirectly benefits from the federal assistance afforded its members. This showing, without more, is insufficient to trigger Title IX coverage.

While the Court of Appeals dispositively relied on the NCAA's receipt of members' dues, it also noted distinctions

between *Paralyzed Veterans* and this case: The NCAA is "created by and comprised of" schools that receive federal funds, and the Association governs its members "with respect to athletic rules." 139 F. 3d, at 188. In these respects, the Third Circuit observed, the relationship between the Association and its members is "qualitatively different from that between airlines and airport operators." *Id.*, at 189. Evident as these distinctions may be, they do not bear on the narrow question we decide today—whether an entity that receives dues from recipients of federal funds is for that reason a recipient itself.

## III

Smith, joined by the United States as *amicus curiae*, presses two alternative theories for bringing the NCAA under the prescriptions of Title IX.[6] First, she asserts that the NCAA directly and indirectly receives federal financial assistance through the National Youth Sports Program NCAA administers. See Brief for Respondent 35–37, 39–41.[7] Second, Smith argues that when a recipient cedes con-

---

[6] Smith's brief to the Third Circuit alluded to these theories. See Brief for Appellant in Nos. 97–3346 and 97–3347 (CA3), pp. 5, 22 (arguing that the NCAA receives federal financial assistance through the National Youth Sports Program it operates); *ibid.* (arguing that an organization that assumes control over a federally funded program is thereby subject to Title IX).

[7] Two District Courts have found that the NCAA's relationship to the National Youth Sports Program creates an issue of fact regarding whether the NCAA is a recipient of federal financial assistance. See *Bowers* v. *National Collegiate Athletic Assn.*, 9 F. Supp. 2d 460, 494 (NJ 1998) (denying NCAA's motion for summary judgment in a Rehabilitation Act suit because "there are genuine questions of material fact as to whether the NCAA receives federal funds through the [National Youth Sports Program Fund]"); *Cureton* v. *National Collegiate Athletic Assn.*, No. Civ. A. 97–131, 1997 WL 634376, *2 (ED Pa., Oct. 9, 1997) (refusing NCAA's motion for summary judgment in a Title VI action). Also, the Department of Health and Human Services has issued two letter determinations that the NCAA is a recipient of federal assistance by virtue of the Department's grant to the National Youth Sports Program Fund. See Brief for

trolling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless whether it is itself a recipient. See *id.*, at 41–46; Brief for United States as *Amicus Curiae* 20–27.

As in *Roberts* v. *Galen of Va., Inc., ante,* at 253–254, and *United States* v. *Bestfoods,* 524 U. S. 51, 72–73 (1998), we do not decide in the first instance issues not decided below.

\* \* \*

For the reasons stated, we conclude that the Court of Appeals erroneously held that dues payments from recipients of federal funds suffice to subject the NCAA to suit under Title IX. Accordingly, we vacate the judgment of the Third Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

---

United States as *Amicus Curiae* 19–20. We, of course, are not positioned to make or currently review factfindings on any alternative theory urged by respondent.