Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 10, 2004      Decided July 9, 2004

No. 03-7044

ADAM BARBOUR,
APPELLEE

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
APPELLANT

UNITED STATES OF AMERICA,
INTERVENOR

Appeal from the United States District Court
for the District of Columbia
(No. 00cv00344)

*Bruce P. Heppen* argued the cause for appellant. With him on the briefs were *Cheryl C. Burke*, *Robert J. Kniaz*, and *Jay R. Goldman*.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Dorene M. Haney* argued the cause and filed the brief for appellee.

*Sarah E. Harrington*, Attorney, U.S. Department of Justice, argued the cause for intervenor. With her on the brief were *R. Alexander Acosta*, Assistant Attorney General, and *Jessica Dunsay Silver*, Attorney.

*Douglas B. Huron* and *Richard A. Salzman* were on the brief for *amicus curiae* Metropolitan Washington Employment Lawyers Association in support of appellee.

Before: SENTELLE, GARLAND, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Dissenting opinion filed by *Circuit Judge* SENTELLE.

GARLAND, *Circuit Judge*: The Washington Metropolitan Area Transit Authority (WMATA) contends that sovereign immunity protects it from being sued in federal court under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, for discriminating on the basis of disability. It insists that it did not waive that immunity by accepting federal financial assistance, and further maintains that Congress lacks power under the Spending Clause to condition the receipt of federal funds on such a waiver. We disagree and hold that WMATA has waived its immunity to Rehabilitation Act suits by taking federal transportation funds.

I

WMATA fired Adam Barbour from his position as a probationary electrician on April 1, 1998. Barbour charges that WMATA fired him because he suffers from a mental disability, bipolar disorder. WMATA denies the charge, maintaining that it terminated Barbour for insubordinate, threatening, and anti-social behavior.

On February 24, 2000, Barbour sued WMATA in the United States District Court for the District of Columbia under federal and local causes of action, alleging that the Authority discriminated against him because of his disability.

Only one cause of action survived WMATA's motions for dismissal and summary judgment: Barbour's claim that his discharge violated § 504 of the Rehabilitation Act. In permitting that claim to go forward, the district court rejected WMATA's contention that the Eleventh Amendment renders WMATA immune from a Rehabilitation Act suit for money damages in federal court.

WMATA now appeals the district court's denial of immunity, a kind of interlocutory appeal over which this court has jurisdiction. *See KiSKA Constr. Corp.-U.S.A. v. WMATA*, 167 F.3d 608, 610–11 (D.C. Cir. 1999). The United States has intervened on Barbour's side, maintaining that WMATA waived its Eleventh Amendment immunity by accepting federal funds, and that the waiver is constitutionally valid. These issues regarding WMATA's immunity are the only ones that we decide on this appeal. Because the claim of immunity presents a legal question, our review is de novo. *See United States v. Microsoft*, 253 F.3d 34, 50-51 (D.C. Cir. 2001).

## II

WMATA, a mass transit system for the District of Columbia and surrounding suburban areas, was created by an interstate compact among Maryland, Virginia, and the District of Columbia, and enjoys the Eleventh Amendment immunity of the two signatory states. *Morris v. WMATA*, 781 F.2d 218, 219-20 (D.C. Cir. 1986); *see Hess v. Port Auth. Trans.-Hudson Corp.*, 513 U.S. 30, 49-50 & n.20 (1994). The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State," the Supreme Court has "extended the Amendment's applicability to suits by citizens against their own states."

*Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 362 (2001).

There are two important exceptions to Eleventh Amendment immunity. First, a state may *waive* its immunity and consent to suit. Second, Congress may exercise its enforcement power under § 5 of the Fourteenth Amendment to *abrogate* a state's immunity without its consent. *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) (citing *Clark v. Barnard*, 108 U.S. 436 (1883), and *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985). Whether WMATA waived its immunity is the question at issue here.

The " 'test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.' " *College Savings*, 527 U.S. at 676 (quoting *Atascadero*, 473 U.S. at 241). The courts will find a waiver if a state makes a "clear declaration" of its intent to submit to federal court jurisdiction. *Id.* To elicit a clear declaration, Congress "may, in the exercise of its spending power, condition its grants of funds to the States upon their taking certain actions that Congress could not require them to take, and . . . acceptance of the funds entails an agreement to the actions." *Id.* at 686. But Congress must exercise its power explicitly: a congressional waiver provision is constitutional only if it manifests "a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Atascadero*, 473 U.S. at 247.

WMATA denies that it consented to waive its Eleventh Amendment immunity from suit under the Rehabilitation Act. First, it contends that Congress did not clearly condition acceptance of federal transportation funds on such a waiver. Second, WMATA maintains that, even if Congress did condition financial assistance on a waiver, WMATA did not knowingly accept the money on that basis. We consider these arguments in turn.

### A

Section 504 of the Rehabilitation Act of 1973 provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). The Act provides remedies for violations of § 504 by "any recipient of Federal assistance." *Id.* § 794a(2). In *Atascadero State Hospital v. Scanlon*, the Supreme Court found that the Rehabilitation Act's "general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment," 473 U.S. at 246, and "likewise falls short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity," *id.* at 247. Accordingly, the Court concluded that the Eleventh Amendment remained effective in proscribing Rehabilitation Act suits against states and state agencies. *Id.*

In 1986, in response to *Atascadero*, Congress passed the Civil Rights Remedies Equalization Act (CRREA), which provides in relevant part:

> A state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1); *see Lane v. Pena*, 518 U.S. 187, 198 (1996). Every circuit that has considered the question — that is, every circuit other than our own and the Federal Circuit — has held that the language of the CRREA unambiguously conditions a state agency's acceptance of federal funds on its waiver of Eleventh Amendment immunity.[1] Al-

---

[1] *See Nieves–Marquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003); *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98 (2d Cir.

beit in dictum, the Supreme Court has said so as well. *See Lane*, 518 U.S. at 200 (declaring that in the CRREA, "Congress responded to our decision in *Atascadero* by crafting *an unambiguous waiver* of the States' Eleventh Amendment immunity") (emphasis added).

Notwithstanding the views of the circuits and of the Supreme Court, WMATA maintains that the CRREA does not make clear that receipt of funds is conditioned on a waiver of immunity. We disagree. The CRREA identifies "recipients of Federal financial assistance" as the *only* entities whose immunity is vulnerable. Moreover, the CRREA waiver is directly tied to Rehabilitation Act § 504, which likewise applies only to discrimination "under any program or activity receiving Federal financial assistance," including state instrumentalities. 29 U.S.C. § 794(a); *see id.* § 794(b). The language of the two statutes together is thus undeniably clear about the simple choice offered to states: if they accept federal funds, they will lose their immunity to Rehabilitation Act suits for discriminatory acts; if they decline the money, they remain free of the Act's proscriptions. WMATA could have avoided the Act — and preserved its immunity — by declining to take federal transportation funds. It chose not to. By stepping into the statute's reach, it voluntarily exposed itself to the suits the statute authorizes.

WMATA insists that the CRREA is ambiguous because its opening clause — "A state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court" — parallels language that Congress has frequently used in attempting to abrogate state

---

2001); *A.W. v. Jersey City Pub. Schs.*, 341 F.3d 234 (3d Cir. 2003); *Litman v. George Mason Univ.*, 186 F.3d 544 (4th Cir. 1999); *Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609 (5th Cir. 2003), *vacated & reh'g en banc granted*, 339 F.3d 348 (5th Cir. 2003); *Nihiser v. Ohio Envtl. Prot. Agency*, 269 F.3d 626 (6th Cir. 2001); *Stanley v. Litscher*, 213 F.3d 340 (7th Cir. 2000); *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000) (en banc); *Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002); *Robinson v. Kansas*, 295 F.3d 1183 (10th Cir. 2002); *Garrett v. University of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288 (11th Cir. 2003).

immunity. The Supreme Court has indeed construed similar statutory language as the language of abrogation. *See, e.g.*, *Garrett*, 531 U.S. at 360 (Americans with Disabilities Act, 42 U.S.C. §§ 12111-12117, 12202); *College Savings*, 527 U.S. at 682 (Lanham Act, 15 U.S.C. § 1122(a)); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 635 (1999) (Patent Remedy Clarification Act, 35 U.S.C. § 296(a)).[2] WMATA argues that, while "abrogation and waiver are related concepts," it is "implausible that the same words would mean both." Appellant's Br. at 5.

Whatever the validity of WMATA's claim that the language of the CRREA's opening clause cannot do double duty, that claim simply ignores the statute's closing words, which, like those of the Rehabilitation Act, single out recipients of "Federal financial assistance" as the only entities within the statute's purview. By contrast, none of the abrogation statutes WMATA cites contains anything more than the naked "shall not be immune" language. This is a distinction of considerable difference.

*College Savings Bank v. Florida Prepaid* makes clear why this distinction matters. In that case, the question was whether Congress could condition a state's sale of a tuition prepayment plan on relinquishment of its immunity to Lanham Act suits for false advertising. The Court held that such a condition amounted to a "forced," rather than a voluntary waiver because the state could not avoid liability except by abstaining from interstate commerce. 527 U.S. at 683. At the same time, however, *College Savings* declared that "conditions attached to a State's receipt of federal funds are simply not analogous to . . . conditions attached to a State's decision to engage in otherwise lawful commercial activity." *Id.* at 678 n.2. As the Court explained, "Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts." *Id.* at 686–87. Thus, what Congress threatens if the state refuses to agree to its spending condition is merely "the denial of a gift or gratuity,"

---

[2] In the cited cases, the Court ruled that abrogation was beyond Congress' authority.

which is "fundamentally different" from the "automatic[ ]" coercion that takes place when "what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." *Id.*[3]

With this distinction, the Supreme Court reaffirmed its prior holdings "that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *Id.* at 686 (citing *South Dakota v. Dole*, 483 U.S. 203 (1987)). Because that is precisely what Congress did in the CRREA, we reject WMATA's contention that its acceptance of funds was insufficient to constitute a valid waiver of its Eleventh Amendment immunity.

## B

WMATA's second argument is that, even if the CRREA did unambiguously condition receipt of funds on a waiver of immunity, the Authority nonetheless did not *knowingly* consent to such a waiver by taking federal funds in 1998, the year in which it terminated Barbour. In that year, WMATA contends, "it reasonably believed that Congress had already abrogated its immunity" from suits for disability discrimination by virtue of Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12112(a). Reply Br. at 7.[4] Although the Supreme Court later held in *Board of Trustees v. Garrett*, 531 U.S. 356 (2001), that Title I exceeded Congress' authority to abrogate sovereign immunity, WMATA argues

---

[3] Although *College Savings* noted that "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion,'" 527 U.S. at 687 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)), WMATA does not suggest that point has been passed here.

[4] Title I bars a covered entity from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

that it could not have predicted that result in 1998. At that time, WMATA maintains, it mistakenly believed that waiving immunity to Rehabilitation Act suits by accepting federal funds would cost it little that the ADA had not already taken. This misapprehension regarding the scope of its existing immunity, WMATA concludes, renders its waiver "unknowing" and hence invalid.

A similar argument prevailed in *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98 (2d Cir. 2001), a case involving alleged disability discrimination by a New York instrumentality in 1995. No other circuit has accepted this argument,[5] and those that have considered the issue have decided to the contrary. *See Doe v. Nebraska*, 345 F.3d 593, 601–02 (8th Cir. 2003); *Garrett v. University of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292–93 (11th Cir. 2003); *M.A. v. State–Operated Sch. Dist.*, 344 F.3d 335, 349–51 (3d Cir. 2003). We likewise reject it, and with it WMATA's claim that it did not knowingly waive its immunity when it took federal transportation funds in 1998. We do so for three reasons.

First, *College Savings* and *Atascadero* establish a single criterion for determining the validity of a waiver: Congress must clearly condition acceptance of federal funds on the state's waiver of its sovereign immunity. *See College Savings*, 527 U.S. at 686; *Atascadero*, 473 U.S. at 247. Although it is true that an effective waiver must be "knowing," accepting federal funds on a clear condition constitutes an objective manifestation of knowledge. As the Court said in *College Savings*, when the condition is explicit, "acceptance of the funds entails an agreement to the actions." 527 U.S. at 686. *See also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.").

---

[5] A panel of the Fifth Circuit agreed with *Garcia*, but the full court vacated that decision pending reconsideration en banc. *See Pace*, 339 F.3d 348 (granting petition for rehearing en banc).

Although *Garcia* conceded that the CRREA "constitutes a clear expression of Congress' intent to condition acceptance of funds on a state's waiver of its Eleventh Amendment immunity," 280 F.3d at 113, it added a second criterion for validity: that "the state, in accepting the funds, *believed* it was actually relinquishing its right to sovereign immunity." *Id.* at 115 n.5 (emphasis added). But the Supreme Court has never considered a state's state of mind when ascertaining whether a waiver has been effected. Rather, it has directed courts to inquire only as to whether the state accepted federal funds in the face of a clear condition. Because that is just what WMATA did, its protestation of lack of knowledge is to no avail.

Second, even *Garcia* recognized that an argument like WMATA's, that a state instrumentality had miscalculated what its immunity was worth, would lose force as the Supreme Court's Eleventh Amendment jurisprudence evolved. Although *Garcia* saw no reason for New York to suspect that the ADA's abrogation was invalid in 1995, it acknowledged that a state's acceptance of funds at a later date — after the Supreme Court issued two decisions that formed the predicate for *Garrett* — "might properly reveal a knowing relinquishment of sovereign immunity." 280 F.3d at 113 n.4. When WMATA accepted federal funds in 1998, both of those predicate decisions had already been issued. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) (holding that legislation promulgated under § 5 of the Fourteenth Amendment that reaches beyond the scope of the Amendment's guarantees must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end"); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996) (holding that Congress lacks authority to abrogate state immunity under Article I of the Constitution). Indeed, WMATA itself argued in another case in 1997 — a year before Barbour was terminated — that the Court's decision in *Seminole Tribe* had rendered invalid Congress' attempted abrogation of state immunity in the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*. *See* Motion to Dismiss ADEA Claims, *Jones v. WMATA*, No. 89–552 (D.D.C. Jan. 14, 1997). Hence, even if we were to

adopt *Garcia*'s analysis, it would be insufficient to sustain WMATA's claim of immunity in this case.

Finally, even if WMATA's state of mind were a relevant consideration, the underlying implication of its argument — that it was only WMATA's miscalculation about whether its immunity had already been abrogated by the ADA that led it to accept federal funds in 1998 — would fail on the facts. The CRREA, after all, was passed in 1986 — four years before the ADA, and hence four years before WMATA could claim that it thought it lost its protection against disability discrimination lawsuits. Nonetheless, WMATA took federal transportation funds during each of those years. Reply Br. at 9. Likewise, although *Garrett* was decided in 2001, WMATA has continued to take federal funds ever since — notwithstanding its knowledge that the ADA's abrogation was ineffective after that date. Indeed, at oral argument, counsel for WMATA conceded that "it is hard to imagine that the Authority would have foregone" the funds in 1998, whatever the impact on its sovereign immunity. Oral Arg. Tr. at 12. It is thus clear that WMATA's decision was not based on a miscalculation about the scope of its sovereign immunity, but rather on a reckoning of the value of the financial assistance offered by the federal government.[6]

## III

As a last argument, WMATA contends that Congress lacks power under the Spending Clause, U.S. CONST. Art. I, § 8, cl.

---

[6] In addition to contending that it believed the ADA had left it with nothing to lose by taking federal funds, WMATA argues that it thought the "abrogation language" of the CRREA similarly left it with liability under the Rehabilitation Act whatever it did. This argument is meritless, and no court has accepted it. As we have noted above, both the CRREA and the Rehabilitation Act apply only to discrimination by recipients of "Federal financial assistance." 42 U.S.C. § 2000d–7(a)(1); 29 U.S.C. § 794(a). Hence, whether WMATA read the CRREA's text as the language of "abrogation" or of "waiver," it had to know that it could wholly avoid liability under the Rehabilitation Act by declining federal funds.

1, to condition WMATA's federal transportation funds on a waiver of immunity from suit under the Rehabilitation Act. Specifically, WMATA argues that the CRREA's waiver condition runs afoul of the Supreme Court's decision in *South Dakota v. Dole*, because it is "unrelated to the federal interest" in transportation funds. 483 U.S. 203, 206-07 (1987).[7] The Court did not elaborate on the meaning of that statement, and it has not done so since, other than to cite *Dole* for the proposition that conditions on the receipt of federal funds must "bear some relationship" to the purpose of the spending. *New York v. United States*, 505 U.S. 144, 167 (1992). Nor has the Court ever overturned Spending Clause legislation on relatedness grounds. Whatever substantive limitation *Dole*'s relatedness requirement poses for congressional power, it is clear that the CRREA has not crossed that line.

In the CRREA, the legislature made clear that it did not want *any* federal funds to be used to facilitate disability discrimination, and that exposing recipient entities to the threat of federal damage actions was an effective deterrent. Congress's spending condition guarantees that federal money is used for the provision of transportation, and nothing else. Every circuit that has considered the issue has concluded that the connection between the congressional goal (that federal transportation funds be used exclusively for that purpose), and the congressional means (the spending condition), is close enough to be sustained under the spending power. *See Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) ("As to the third [*Dole*] requirement, § 2000d-7 is manifestly related to Congress's interest in deterring federally supported agencies from engaging in disability discrimination."); *A.W. v. Jersey City Pub. Schs.*, 341 F.3d 234, 243 (3d Cir. 2003) (same); *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002) (same).

---

[7] *Dole* listed a number of other limits on Congress' Spending Clause authority. WMATA does not contend that any of those apply here, except insofar as *Dole*'s requirement that funding conditions be "unambiguous," 483 U.S. at 207, is relevant to WMATA's arguments about waiver, a point we addressed in Part II.A.

We do not break any new ground in reaching the same conclusion. As the United States points out, the Rehabilitation Act's nondiscrimination requirement is patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), which prohibit, respectively, race and sex discrimination in programs or activities that receive federal funds. *See NCAA v. Smith*, 525 U.S. 459, 466 n.3 (1999). In *Lau v. Nichols*, the Supreme Court upheld Title VI as valid Spending Clause legislation: "The Federal Government has power to fix the terms on which its money allotments to the States shall be disbursed. Whatever may be the limits of that power, they have not been reached here." 414 U.S. 563, 569 (1974). Similarly, with respect to Title IX, the Court held in *Grove City College v. Bell* that "Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept." 465 U.S. 555, 575 (1984) (citing *Pennhurst*, 451 U.S. at 17, where the Court noted that, "pursuant to the spending power, . . . Congress may fix the terms on which it shall disburse federal money" if it does so "unambiguously").

WMATA's only response is to note, correctly, that *Lau* and *Grove City* predate *Dole*. But *Dole* itself cited *Lau* as a case in which Congress had lawfully used the spending power " 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.' " *Dole*, 483 U.S. at 206 (citing *Lau*, and quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (opinion of Burger, C.J.)). The Supreme Court has never suggested that it has any second thoughts about its treatment of the spending power in either *Lau* or *Grove City*.[8] To the contrary, in *New York v. United States*, the Court again held up *Lau* as an example of a Spending

---

[8] The Court did subsequently reject *Lau*'s interpretation of Title VI as extending beyond intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 285 (2001). And the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687, superceded *Grove City*'s interpretation of the scope of Title IX. *See NCAA*, 525 U.S. at 465-66 & n.4; *see also* 29 U.S.C. § 794(b).

Clause case in which it had "found no constitutional flaw in a federal statute." 505 U.S. at 167. Nor did the specific condition imposed by regulation in *Lau* — that school systems provide language instruction for non-English-speaking students — bear a more "obvious relation," Dissenting Op. at 6, to the general federal (educational) appropriation to which it was tied than does the condition here. Nothing in *Lau* suggested that the federal funds were, or had to be, intended for classroom instruction rather than, for example, the acquisition of equipment or the construction of athletic facilities. *See* 42 U.S.C. § 2000d (barring discrimination in "any program or activity receiving Federal financial assistance").

In its most recent Spending Clause case, the Court confirmed the constitutionality of 18 U.S.C. § 666(a)(2), which makes bribery of officials of state entities that receive in excess of $10,000 in federal funds a federal crime, and which does not require a connection between a given bribe and a particular federal grant. *See Sabri v. United States*, 124 S. Ct. 1941 (2004).[9] "Congress has the authority under the Spending Clause to appropriate federal monies to promote the general welfare, Art. I § 8, cl. 1," the Court said, "and it has corresponding authority under the Necessary and Proper Clause, Art. I § 8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft." *Id.* at 1946. That statement echoes the congressional purpose underlying Title VI, as the Court understood it in *Lau*: " 'Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination.' " 414 U.S. at 569 (quoting 110 Cong. Rec. 6543 (March 30, 1964) (Sen. Humphrey, quoting President Kennedy's message to

---

[9] The dissent's contention that *Sabri* is distinguishable because "[r]ampant bribery of WMATA officials . . . would make it more difficult for federal funds to do the job of providing mass transit," while disability discrimination "would not," Dissenting Op. at 7, overlooks the Court's recognition that § 666 does not require "any connection between a bribe or kickback and some federal money." 124 S. Ct. at 1945.

Congress, June 19, 1963)). We see no reason why it should matter, for purposes of the Spending Clause, that in the case before us Congress' concern runs to discrimination on the basis of disability rather than race. Indeed, Congress reasonably can insist that decisions regarding the expenditure of federal funds not be based on irrational discrimination. Such discrimination "fritter[s] away" federal funds, 124 S. Ct. at 1946, just like the graft discussed in *Sabri*, and insisting on a waiver of immunity to help combat it is just as closely related to the underlying purpose of providing such funds.

Finally, we note an analytic difference that may be at the root of our disagreement with our dissenting colleague. In his view, "conditional funding grants are no less regulatory than any form of federal regulation of the states." Dissenting Op. at 2. On this point, however, *College Savings* teaches otherwise, and it is worth repeating that opinion's key passage here:

> As we have held in such cases as *South Dakota v. Dole*, 483 U.S. 203 (1987), Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take.... These cases seem to us fundamentally different from the present one [about regulation under the Lanham Act].... Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts.

527 U.S. at 686–87.

IV

We hold that WMATA waived its immunity from suit under the Rehabilitation Act by accepting federal transportation funds, and that Congress had authority under the Spending Clause to condition the receipt of federal funds on such a waiver. The judgment of the district court is therefore

*Affirmed.*

SENTELLE, *Circuit Judge*, dissenting: The majority holds that the Washington Metropolitan Area Transit Authority ("WMATA"), an entity created pursuant to an interstate compact among Maryland, Virginia, and the District of Columbia that possesses Eleventh Amendment immunity, *see Morris v. WMATA*, 781 F.2d 218, 219-20 (D.C. Cir. 1986), has waived its immunity pursuant to 42 U.S.C. § 2000d-7 by accepting federal transportation funds. It also holds that this waiver and section 504 of the Rehabilitation Act, which together subject WMATA to private damages suits for employment discrimination on the basis of disability, represent a valid exercise of Congress's power to appropriate money to "provide for the common Defence and general Welfare of the United States" as applied in this case. U.S. Const. art. I, § 8, cl. 1. In my view, the second holding contravenes the principle that "Congress' authority is limited to those powers enumerated in the Constitution, and . . . those enumerated powers are interpreted as having judicially enforceable outer limits." *United States v. Lopez*, 514 U.S. 549, 566 (1995).

I would hold that conditioning acceptance of federal transportation funds on a state's acquiescence to private damages suits for disability discrimination in employment is not a valid exercise of Congress's power under the Spending Clause under the rule of *New York v. United States*, 505 U.S. 144, 167 (1992), and *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). I would further hold that this step is not within Congress's enforcement power under section 5 of the Fourteenth Amendment.

I would reverse the judgment of the district court for the reason that Congress lacks the power to subject states, or entities like WMATA treated as states for purposes of immunity, to suits for money damages for disability discrimination in the manner it has done here.

A. Spending Clause

With all respect, I disagree with the majority that Congress has the power under the Spending Clause to expose the states to liability for the sort of suit Barbour brought against WMATA. "Congress may attach conditions on the receipt of

federal funds," but "[s]uch conditions must (among other requirements) bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)) (internal quotation marks omitted). That relationship is a nexus between the condition imposed and the "federal interest in particular national projects or programs" represented by the grant of funds. *Dole*, 483 U.S. at 207 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)).

The *Dole* principle is fundamental to our constitutional structure. Without it, "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167. As the Supreme Court explained in the only case in which it struck down an Act of Congress as exceeding Congress's Spending Clause authority, it is implausible to presume that

> the makers of the Constitution, in erecting the federal government, intended sedulously to limit and define its powers, so as to reserve to the states and the people sovereign power, to be wielded by the states and their citizens and not to be invaded by the United States, they nevertheless by a single clause gave power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed.

*United States v. Butler*, 297 U.S. 1, 78 (1936).

True, a state can simply decline to accept a conditional funding grant, but such grants are no less regulatory simply because acceptance is optional. The offer of funds creates an incentive to comply with the regulation regardless and therefore represents a direct and real attempt by the federal government to regulate even if the condition is declined. In this respect, conditional funding grants are no less regulatory than any form of federal regulation of the states. Direct regulations threaten penalties; conditional funding grants threaten to withhold rewards. There is no functionally significant distinction between the two sorts of inducements as to

their *regulatory* character (though of course, as the majority points out, there are *other* differences, like those pointed out by the Supreme Court in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 686-87 (1999)).[1] The germaneness requirement of *South Dakota v. Dole* and *New York v. United States* is therefore essential to maintain some semblance of the Framer's original framework of a federal government of limited and enumerated regulatory power.

There is no reasonably close relationship between the grant of funds here and the imposed condition. The purpose of the federal funds WMATA receives is to subsidize the mass-transit services WMATA provides. They are transportation funds. As applied in this case, the condition is subjecting WMATA to a private suit for money damages for discriminating against its employees on the basis of disability. Prohibiting disability discrimination in employment is simply not "Necessary and Proper," U.S. Const. art. I, § 8, cl. 18, to spending money for mass transit. The effect of such a prohibition is to create an entitlement for the disabled, perhaps a laudable goal, but not one necessary or proper to providing mass transit.

Barbour's brief offers no answer to this argument. The government and the majority make an attempt to fill this

---

[1] My point is that the two sorts of powers are equally *regulatory*, and therefore that the *Lopez* principle applies to Spending Clause conditions with full force, not that there no functional differences between the two. *College Savings Bank* recognizes that Spending Clause conditions differ from direct regulations under Congress's other Article I powers in that the latter are coercive. 527 U.S. at 686-87. The point, again, is that both are equally regulatory.

In any event, my disagreement with the majority in no way turns on this dispute over this aspect of Congress's Spending-Clause power. The majority assumes that there are limits to that power. The core of our disagreement is whether Congress's disapproval of disability discrimination is enough of a connection between the transportation funds and the condition imposed here. In my view, it is not.

gaping void in Barbour's case. However, I am not convinced that the connection they assert between the funds and the condition here is constitutionally adequate.

Following the government and several other circuits, the majority asserts that Congress's judgment that "it did not want *any* federal funds to be used to facilitate disability discrimination" in employment is enough of a connection between the condition here and the mass-transit funds. Maj. op. at 12. This cannot be right. The majority and the government are saying that the legislature can identify something a state does that it does not like – in this case, discriminate on the basis of disability – and condition *any* grant of funds on a state's not doing that act any more, assuming the condition is otherwise constitutionally valid. Presumably, Congress has an "interest" in preventing states from doing anything with its funds that it does not like, and there is nothing magical about disability discrimination that makes the "interest" in preventing it distinctively federal. If such an "interest" were enough to sustain such legislation, that would leave the Spending Clause without any "judicially enforceable outer limit[ ]." *Lopez*, 514 U.S. at 566. In a system in which the federal government's powers remain limited and enumerated, such an argument must fail.

The reasoning of the circuits the majority cites is no better. The First Circuit's reasoning consists of a single sentence, to wit, that the condition "is manifestly related to Congress's interest in deterring federally supported agencies from engaging in disability discrimination." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (citing *A.W. v. Jersey City Public Schools*, 341 F.3d 234 (3d Cir. 2003)). As discussed, however, the proper test under *Dole* and *New York* is whether the condition is germane to the interest in the "*particular* national project[ ] or program[ ]," *Dole*, 483 U.S. at 207 (emphasis added), not whether Congress has a generalized "interest" in imposing the condition. For the reasons I have stated, the condition here fails the *Dole* test as properly understood. The Third and Ninth Circuits' reasoning essentially tracks the reasoning of the First Circuit. *See A.W.*, 341 F.3d at 243-44; *Koslow v. Pennsylvania*, 302 F.3d 161, 175-76

(3d Cir. 2002); *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002).

Nor do I think that the majority's holding follows from the three Supreme Court cases it cites. The majority relies heavily on *Lau v. Nichols*, 414 U.S. 563 (1974). *Lau* was a class-action suit brought against San Francisco Unified School District officials for violating regulations promulgated by the Department of Health, Education, and Welfare pursuant to Title VI of the of the Civil Rights Act of 1964, which prohibited state programs or activities that receive federal funds from discriminating on the basis of race, color, or national origin. *Id.* at 566. The regulation required the school district, "[w]here inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program offered by a school district, [to] take affirmative steps to rectify the language deficiency." *Id.* at 568. Plaintiffs claimed that the school district had not given 1,800 students of Chinese ancestry language instruction, and therefore violated this regulation. The Court, per Justice Douglas, held that this regulation was a valid exercise of Congress's spending power, as the schools received federal educational funds. *Id.* at 569.

Quoting dicta from *Lau*, the majority states that "[s]imple justice requires that public funds, to which taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination." Maj. op. at 14 (internal quotation marks and citation omitted). The principle the majority quotes from *Lau*, which was itself a quotation from a floor speech given by Senator Hubert Humphrey during the debates on the Civil Rights Act of 1964, is obvious dicta, and singularly unpersuasive dicta at that. A policy argument made in a floor statement by a Senator cannot be the basis of a legal doctrine meant to restrain the very exercise of policy-making power such an argument represents. Racial discrimination, in fact, was not at issue in *Lau* at all; it was a challenge to a regulation that prohibited national-origin discrimination. Neither *Lau* nor the Supreme Court's description of *Lau* in *New York v.*

*United States*, 505 U.S. at 167, is, as the majority implies, authority for the notion that Congress may condition any appropriation on a state's agreeing to *any* "nondiscrimination" rule, because in *Lau* the school district's failure to provide language instruction to foreign-born students bore an obvious relation to the federal educational appropriations the school district received. In this case, there is no such relationship.[2]

Equally distinguishable is the Supreme Court's recent decision in *Sabri v. United States*, 124 S. Ct. 1941 (2004), also cited by the majority. In *Sabri*, the Court held that conditioning federal funds on criminalizing bribery of officials of state entities that receive at least $10,000 in federal funds was a valid exercise of Congress's Spending Clause power. The Court reasoned that there was a generalized interest linked to all particular federal appropriations in preventing local officials from being bribed, because "bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value," *id.* at 1946, and because "Congress was within its prerogative to protect spending objects from the menace of local administrators on the take," *id.* at 1947.

This unexceptional recognition of the link between any federal appropriation and the federal government's interest in ensuring that such an appropriation is not "frittered away in graft," *id.* at 1946, falls far short of establishing the same sort of link between "discrimination" generally and any federal appropriation. As with graft, of course, the federal govern-

---

[2] My point is not that the federal funds must be specifically appropriated for classroom instruction, but that the condition imposed on receiving the funds must be necessary and proper to providing education, regardless of how broad the educational programs financed by the funds are. That was true in *Lau.* Because prohibiting disability discrimination is not necessary and proper to providing mass transit, *Lau* is not applicable. The majority's explanation that "[n]othing in *Lau* suggested that the federal funds were, or had to be, intended for classroom instruction rather than, for example, the acquisition of equipment or the construction of athletic facilities," Maj op. at 14, does not speak to this point.

ment may not like discrimination; but preventing graft ensures that funds are spent for the particular purposes for which Congress appropriated them, as opposed to any congressional purpose or "interest" whatsoever. Rampant bribery of WMATA officials, for example, would make it more difficult for federal funds to do the job of providing mass transit.[3] So far as I can see, and so far as the government and majority's reasoning goes, discrimination against WMATA's employees on the basis of disability would not.[4]

---

[3] This is the reason the Court did not need to require a connection between the bribe and the federal money: *any* bribe, the Court reasoned, bears a relation to the particular purpose of a grant of funds (whether it be mass transit, education, or mushroom subsidies). Bribed officials are untrustworthy regardless of the reason the government appropriates the funds. Thus, my distinction of *Sabri* does not, as the majority states, "overlook[ ]", Maj. op. at 14 n.9, the fact that the Court did not require this connection. To the contrary, it explains why the court did not require it.

[4] The majority's attempt to assert a particular connection between mass transit and disability discrimination is that "discrimination 'fritter[s] away' federal funds . . . just like the graft discussed in *Sabri*," [Maj. op. at 15], and it is doubtful. The Supreme Court's point in *Sabri* was that bribed officials divert funds toward the source of the bribe to advance their own personal financial gain, necessarily away from the congressionally specified purpose for spending the funds. The fact that such officials are untrustworthy in this way therefore gave the Court a reason, apart from Congress's judgment that it did not like graft, to think that such a condition was necessary and proper to providing any federal funds.

There is no reason to believe that a similar diversion or lack of trustworthiness, and therefore, a similar connection to the federal funds, occurs when officials discriminate on the basis of disability against their employees. Discriminating on the basis of disability has nothing to do with "wasting" or "diverting" mass transit funds. To the contrary, requiring WMATA to pay money damages for such discrimination affirmatively depletes its transportation funds. There is therefore no reason, apart from Congress's judgment that its money should not finance activities it believes morally opprobrious, to think that the disability discrimination "fritters away" funds

The final Supreme Court case cited by the majority, *Grove City College v. Bell*, 465 U.S. 555 (1984), did not involve the Spending Clause at all, but instead was a First Amendment case, *id.* at 575.[5]  It therefore sheds little light on the issues here.

For all of these reasons, I conclude that Congress lacks the power under the Spending Clause to subject WMATA to suits for money damages for disability discrimination in employment.

B.  Section 5 of the Fourteenth Amendment

My conclusion as to Congress's power under the Spending Clause requires me, unlike the majority, to reach whether Congress has the power to do the same pursuant to its enforcement power under section 5 of the Fourteenth Amendment.  I would hold that it does not.

Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."  Although the power to "enforce" seems by its terms to be limited to legislation to remedy actual Fourteenth Amendment violations, *see Tennessee v. Lane*, 124 S. Ct. 1978, 2009-10 (2004) (Scalia, J., dissenting), the Supreme Court has held that "Congress' power to enforce the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text," *Bd. of Trustees of the Univ. of*

---

the way graft does.  A judgment that an activity is morally wrong is not a connection between a condition and the funding program under the *Dole* test.

[5] While the majority says that the Supreme Court in *Grove City* "treat[ed] the spending power" and implies that the reason this is so is because *Grove City* cited *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), a Spending Clause case.  Maj. op. at 13.  The reference quoted by the majority was in fact a part of the First Amendment analysis, not a delineation of the reach of the spending power.

*Ala. v. Garrett*, 531 U.S. 356, 365 (2001) (internal quotation marks and citation omitted). Those enforcement steps that reach beyond the scope of the Fourteenth Amendment's substantive guarantees, however, "must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Id.* (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).

Here, as was the case in *Garrett*, the constitutional right Congress is attempting to enforce is Barbour's Fourteenth Amendment right to be free from irrational discrimination in employment on the basis of his disability. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). The question becomes, then, whether subjecting WMATA to suits for money damages for disability discrimination on the basis of his employment is a "congruent and proportional" remedy for Barbour's right. As the Supreme Court held in *Garrett*, that requires me to examine whether "Congress identified a history and pattern of unconstitutional discrimination … against the disabled" to justify the need for such a remedy, 531 U.S. at 368, in particular, a pattern of state discrimination not "rationally related to a legitimate governmental purpose," *Cleburne*, 473 U.S. at 446.

While I confess not to have engaged in a comprehensive independent review of the history of Rehabilitation Act section 504 and § 2000d-7(a)(1), the evidence that Barbour cites at least seems to fall woefully short of demonstrating anything approaching a widespread pattern of unconstitutional discrimination against the disabled by the states in general or WMATA in particular. (The government's brief does not address the section 5 issue, only the Spending Clause issue.) Barbour cites evidence before Congress that he claims demonstrates that "States were not serving the most severely disabled" as of 1973, the year the Rehabilitation Act was passed. Br. for Appellee at 26. That falls far short of establishing the pattern *Cleburne* requires.

Moreover, the remedies created by the Rehabilitation Act against the states "raise the same sort of concerns as to congruence and proportionality as were found in *City of*

*Boerne.*" *Garrett*, 531 U.S. at 372. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination in any program or activity receiving Federal financial assistance," 29 U.S.C. § 794, without regard to whether such conduct has a rational basis. This "accommodation duty far exceeds what is constitutionally required in that it makes unlawful a range of alternative responses that would be reasonable but would fall short of" providing benefits to all persons regardless of their disabilities. *Garrett*, 531 U.S. at 372. The remedies authorized by the Rehabilitation Act, in short, sweep far beyond what is constitutionally permissible.

I realize that the Supreme Court recently upheld Title II of the Americans with Disabilities Act as a valid exercise of Congress's section 5 enforcement power in *Tennessee v. Lane*, 124 S. Ct. 1978 (2004). But this case is not like *Lane*. It is instead very much like *Garrett*, in which the Supreme Court held that Congress exceeded its enforcement power under Title I of the ADA by subjecting states to suits for money damages for disability discrimination in employment. 531 U.S. at 373-74. Title I concerns discriminating against the disabled in employment; *Lane*, in contrast, involved Title II, which prohibits discrimination against the disabled in public services, programs, and activities. *See Lane*, 124 S. Ct. at 1996 (Ginsburg, J., concurring). That broader scope meant that the constitutional rights Title II of the ADA purported to "enforce" in *Lane* concerned, in addition to *Cleburne*-style irrational discrimination, "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review," for example, the right of access to courts, *id.* at 1988. This case, in contrast, only involves, as discussed, Barbour's right to be free from irrational discrimination. Barbour's employment discrimination suit is more like a Title I than a Title II action. And as noted, Barbour has not shown that his suit for money damages is justified by the need to remedy a widespread pattern

of state infringement of his right to be free from irrational employment discrimination.

In sum, I would hold that subjecting WMATA to suits for money damages for disability discrimination in employment exceeds Congress's power under section 5 of the Fourteenth Amendment. Because Congress had no power either under the Spending Clause or under the Fourteenth Amendment to authorize Barbour's suit for damages, I would hold that WMATA is immune under the Eleventh Amendment from the suit. I would accordingly reverse the judgment of the district court and remand the case with instructions to dismiss the suit for lack of jurisdiction.