**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOIS SHARER; STEVEN HUMBER,
        *Plaintiffs-Appellants,*

v.

STATE OF OREGON; PETER OZANNE;
PETER GARTLAN,
        *Defendants-Appellees.*

No. 08-35396

D.C. No.
3:04-CV-01690-BR

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
June 3, 2009—Portland, Oregon

Filed September 21, 2009

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

Stephen L. Brischetto, Portland, Oregon, for the plaintiffs-appellants.

John R. Kroger, Attorney General; Rolf C. Moan, Acting Solicitor General; Leigh A. Salmon (argued), Assistant Attorney General, Salem, Oregon, for defendants-appellees.

## OPINION

FISHER, Circuit Judge:

Lois Sharer appeals from the district court's grant of summary judgment to defendants on her disability discrimination claim under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The district court determined that Oregon's Office of Public Defense Services ("OPDS") was not a "program or activity receiving Federal financial assistance" within the meaning of section 504 during the period of alleged discrimination. *Id.* § 794(a). Sharer also appeals the district court's denial of her claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54. We have jurisdiction under 28 U.S.C. § 1291, we review de novo a grant of summary judgment, *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1123 (9th Cir. 2008), and we affirm.[1]

---

[1]We address appellant Steven Humber's appeal in a concurrently filed memorandum disposition.

## I. Background

Sharer was employed as a legal assistant for the OPDS and its predecessor agency, the Oregon Public Defender Office, from 1999 until May 2003. She alleged that she was a disabled individual with post-traumatic stress disorder, anxiety disorder, depression and agoraphobia. Sharer claimed that defendants State of Oregon and two of her supervisors, Peter Ozanne and Peter Gartlan, failed to provide her with reasonable accommodation, terminated her because of an actual or perceived disability and terminated her for asserting her federally protected rights to be free from discrimination on the basis of disability. She alleged violations of section 504 and the FMLA, as well as other claims not at issue on this appeal. The district court granted defendants' motion for summary judgment on Sharer's section 504 claim, concluding that she failed to meet her burden of establishing that OPDS was a "program or activity receiving Federal financial assistance." The court also granted summary judgment on her FMLA claim. Sharer appealed.

## II. Section 504

**[1]** Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance*." 29 U.S.C. § 794(a) (emphasis added). Defendants argue that Sharer's section 504 claim fails because OPDS was not a "program or activity receiving Federal financial assistance" at the time of the alleged discrimination. We agree.

**[2]** Section 504 defines "program or activity" to include "all the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government." *Id.* § 794(b)(1)(A). Congress adopted this broad definition in response to *Consolidated Rail Corp. v. Darrone*,

465 U.S. 624, 635-36 (1984), where the Court narrowly construed "program or activity" to reach "only the specific parts of a recipient's operation which directly benefited from federal assistance." *Haybarger v. Lawrence County Adult Prob. & Parole*, 551 F.3d 193, 199 (3d Cir. 2008); *see also* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, §§ 2, 4, 102 Stat. 28 (1988). To honor Congress' intent, we "interpret[ ] 'program or activity' broadly." *Haybarger*, 551 F.3d at 200.

**[3]** At the same time, "to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction," *Pub. Citizen v. DOJ*, 491 U.S. 440, 455 (1989), we interpret "program or activity" to place meaningful constraints on section 504's scope. The "program or activity" language has constitutional significance because it limits section 504's reach so that it "does not encompass all the activities of the State," thus ensuring Congress acted within its Spending Clause power "when it conditioned the receipt of [section 504] funds on a waiver of sovereign immunity." *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002); *see also Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc) (explaining section 504 does not violate the Spending Clause because "[a] State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others"). Mindful of these considerations, we conclude OPDS is not a "program or activity receiving Federal financial assistance," and the State therefore did not waive immunity for claims brought against the agency under section 504.

## A. Oregon's "Judicial Department"

Whether a particular state entity is a program or activity receiving federal financial assistance within the meaning of section 504, though itself "a question of federal law[,] . . . can be answered only after considering the provisions of state law

that define the agency's character." *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997) (discussing whether an agency is "an arm of the State" for Eleventh Amendment sovereign immunity purposes); *see also Haybarger*, 551 F.3d at 201 ("[t]hough not dispositive, a State's characterization of an entity under state law is significant" in determining whether that entity is a "program or activity" under section 504). Therefore, we look to the state constitutional and statutory regime governing OPDS to determine whether it is, for section 504 purposes, a "program or activity receiving Federal financial assistance."

**[4]** Sharer contends that OPDS, together with Oregon's state courts and their administrative apparatus, comprise a uniform "judicial department" organized under Article III of the Oregon Constitution. This article provides that "[t]he powers of Government shall be divided into three separate [sic] *departments*, the Legislative, the Executive, including the administrative, and the Judicial." Or. Const. art. III, § 1 (emphasis added). Defendants concede that Oregon's judicial branch of government receives federal financial assistance. It follows from this concession that, insofar as OPDS is organized under the State's judicial branch, and that branch should be considered a unitary "department" or "agency" for section 504 purposes, Sharer would be entitled to pursue her disability discrimination claim. *See* 29 U.S.C. § 794(b)(1)(A).

**[5]** During the relevant period, OPDS was located within the judicial branch of Oregon's government. A 2001 Oregon session law reorganizing the State's public defender system established a Public Defense Services Commission ("Commission") "in the judicial branch of state government," Or. Rev. Stat. § 151.213(1), and charged the Commission with establishing the OPDS "to carry out the administrative policies and procedures for the public defense system," *id.* §§ 151.216(1)(b), 151.211(5). *See* 2001 Or. Laws ch. 962.[2]

---

[2]Although portions of the 2001 session law did not become effective until October 1, 2003, all portions relevant to this analysis were operative as of October 1, 2001. *See* 2001 Or. Laws ch. 962, § 15.

Thus, OPDS was established within Oregon's "judicial department" — that is, the judicial branch of Oregon's government — as the administrative arm of the Commission.

It does not follow, however, that Oregon's judicial "department" of government comprises a unitary "department" or "agency" within the meaning of section 504. Oregon's statutes draw a distinction between the State's "judicial department" (lower case), which refers to the judicial branch of government in its entirety, and the "Judicial Department" (upper case), which refers to the predominant administrative agency within the judicial branch. Section 1.002(1), for example, provides that the Oregon Supreme Court "is the highest judicial tribunal of the *judicial department* of government in this state," but that the Chief Justice may "[s]et staffing levels for all courts of the state operating under the *Judicial Department* and for all operations in the *Judicial Department*," "[e]stablish budgets for the *Judicial Department* and all courts operating under the *Judicial Department*" and "[a]ssign or reassign all court staff of courts operating under the *Judicial Department*." Or. Rev. Stat. § 1.002(1) (emphasis added). Similarly, section 8.125 provides that "[t]he State Court Administrator shall, to the extent directed by the Chief Justice of the Supreme Court . . . [s]upervise and maintain the law libraries of the *judicial department* of government of this state," but that he or she shall "[e]nter into contracts on behalf of the *Judicial Department*." *Id.* § 8.125.[3] Oregon's statutes also make clear that the Commission and the Judicial Department are distinct administrative entities. A statute pertaining to the State's financial administration, for example, defines "state agency" to include "the courts and their officers and committees . . ., at their option," and — separately — "the Public Defense Services Commission, at the option of the

---

[3]Reenforcing this distinction, the Oregon Governor's 2005-2007 recommended budget for the state, defines the "Judicial Department" to include, among other things, the operations of the courts and the State Court Administrator, but not the Commission.

*commission."* *Id.* § 291.030. Another statute authorizes the state treasurer to establish "procedures for the efficient handling of cash and cash equivalents under the control of the . . . the Judicial Department" and — again, separately — "the Public Defense Services Commission." *Id.* § 293.875(1).

Because the Commission (of which OPDS is a subunit) and the Judicial Department are distinct entities within Oregon's judicial branch, we next must consider whether these entities are sufficiently independent from one another to constitute separate "department[s]" or "agenc[ies]" under section 504. *Cf. Haybarger*, 551 F.3d at 202 (holding that parole officer employed by a "subunit" of a Pennsylvania state judicial district could bring a claim under section 504 because a different subunit within the district received federal funds); *Thomlison v. City of Omaha*, 63 F.3d 786, 789 (8th Cir. 1995) (holding that an employee of public safety department's "Fire Division" could bring a section 504 claim where the department's "Police Division" received federal funds). Oregon's statutes demonstrate that these entities, though part of the same branch of government, have distinct funding sources and administrative apparatuses. With regard to their funding, the Commission is financed through an account in the State's "General Fund," Or. Rev. Stat. § 151.225(1), whereas the Judicial Department is financed through an "Operating Account" in the State Treasury that is "separate and distinct from the General Fund." *Id.* § 1.009(1). In terms of their administration, the Chief Justice of the Oregon Supreme Court is "the administrative head of the judicial department of government," including OPDS. *Id.* § 1.002(1). The Chief Justice's statutory authority over the Commission, however, is considerably more circumscribed than his authority over the Judicial Department. The Chief Justice is authorized to appoint the seven members of Commission, and serves as a nonvoting, ex officio member. *See id.* § 151.213(2). "Except for the appointment or removal of commission members," however, "the commission and employees of the commission are not subject to the exercise of administrative authority and supervision by

the Chief Justice of the Supreme Court as the administrative head of the Judicial Department." *Id.* § 151.213(1). By contrast, the Chief Justice's broad authority over the Judicial Department includes the power to establish its budgets, set its staffing levels and "[a]ssign or reassign all court staff." *Id.* § 1.002(1).

**[6]** In light of the Judicial Department and Commission's distinct funding sources and administration, we conclude that the entities are not "linked . . . by virtue of their status under [Oregon] law." *Haybarger*, 551 F.3d at 202. Unlike the "subunits" of government considered in *Haybarger*, the Commission is "independent" from the Judicial Department in terms of its administrative structure, and the judicial branch's federal funds "are [not] imputed" to the Commission. *Id.* We therefore hold that the Commission — and hence OPDS — is not a "program or activity receiving Federal financial assistance" within the meaning of section 504 simply by virtue of the Judicial Department's receipt of federal funds.

## B.  Financial Assistance to OPDS

**[7]** Sharer further argues that, regardless of whether OPDS and the Judicial Department are distinct departments or agencies under section 504, OPDS itself received two kinds of federal financial assistance. First, Sharer contends that she was initially hired in November 1997 by OPDS's predecessor agency through a program under which Oregon's Department of Vocational Rehabilitation ("DVR") subsidized her wages using federal funds. Section 504's reach, however, encompasses a department or agency receiving federal funds in "only those periods during which the funds are accepted." *Garcia v. SUNY Health Scis. Ctr.*, 280 F.3d 98, 113 n.2 (2d Cir. 2001). Therefore, the circumstances of Sharer's hiring in 1997 are irrelevant to whether she can bring a section 504 claim based on discrimination that allegedly occurred in 2003.[4]

---

[4]Sharer testified that she was aware of another employee OPDS hired through the federally funded DVR program, but she did not state the

**[8]** Second, Sharer contends OPDS received federal financial assistance by relying on the Judicial Department (which defendants concede received federal financial assistance) to subsidize the costs of ordering transcripts for indigent defendants. Sharer is correct that, for purposes of section 504, "[f]ederal financial assistance can be direct or indirect." *Herman v. United Bhd. of Carpenters*, 60 F.3d 1375, 1381 (9th Cir. 1995). But while "[e]ntities that receive federal assistance . . . through an intermediary[ ] are recipients" under section 504, "entities that only benefit economically from federal assistance are not." *NCAA v. Smith*, 525 U.S. 459, 468 (1999) (holding that the NCAA's acceptance of dues from colleges receiving federal funding did not render the NCAA liable under Title IX); *see id.* at 466 n.3 (noting scope of the federal funding requirements of "several other federal antidiscrimination measures," including section 504, "is defined in nearly identical terms" to the Title IX requirement).

**[9]** Here, there is no evidence that the Judicial Department financed OPDS's provision of transcripts "with federal funds earmarked for that purpose." *Id.* at 468. Indeed, under the statutory framework operative during the relevant period, the costs of indigent defendants' transcripts were "paid by the state from funds for that purpose." Or. Rev. Stat. § 138.500(5) (1999).[5] We therefore conclude that, at most, OPDS "only benefit[s] economically from federal assistance" in receiving

period during which the other employee was hired. Therefore, this testimony likewise fails to establish that Oregon waived immunity with respect to OPDS during the period of Sharer's alleged discrimination.

[5]Oregon Revised Statute § 138.500(5) was amended by the 2001 session law establishing the Commission such that "[t]he cost of the transcript preparation" for indigent defendants is now "paid for as provided by the policies, procedures, standards and guidelines of the Public Defense Services Commission." *See* 2001 Or. Laws ch. 962, § 29 (codified at Or. Rev. Stat. § 138.500(3)(b)). This provision, however did not become operative until October 1, 2003, subsequent to the period of Sharer's alleged discrimination. *See id.* § 15.

aid from Oregon's Judicial Department for the provision of transcripts.

**[10]** Accordingly, we hold that, notwithstanding defendants' concession that the Judicial Department received federal funds, Sharer was not "subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

## III.   Family and Medical Leave Act

**[11]** Sharer also appeals from the district court's grant of summary judgment to defendants on her claim under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54. We conclude that Sharer's FMLA claim is without merit. Even assuming she could be found to have invoked her FMLA rights, the record shows her claim to be without merit. We therefore affirm the district court's entry of summary judgment on that claim.

**AFFIRMED.**