*T.W. v. Board of Law Examiners*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2020

(Argued: October 8, 2020      Decided: April 28, 2021)

No. 19-4136

_____

T.W.

*Plaintiff-Appellee,*

-v.-

NEW YORK STATE BOARD OF LAW EXAMINERS, DIANE BOSSE, JOHN J. MCALARY,
BRYAN WILLIAMS, ROBERT MCMILLEN, E. LEO MILONAS, MICHAEL COLODNER

*Defendants-Appellants.*

_____

Before:      LIVINGSTON, *Chief Judge*, CHIN, *Circuit Judge*, FAILLA, *Judge*.[1]

T.W. sued the New York Board of Law Examiners (the "Board" or "BOLE") under Section 504 of the Rehabilitation Act, which proscribes discrimination against persons with disabilities.   As an arm of the State, the Board is entitled to immunity under the Eleventh Amendment from suit under Section 504 unless it is a "program or activity receiving Federal financial assistance."   29 U.S.C. § 794(a).

---

[1] Judge Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

The Rehabilitation Act defines "program or activity" broadly to mean "all the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance." *Id.* § 794(b). The district court held that the Board was not immune from T.W.'s claim under the Rehabilitation Act because it was a program or activity of a department, agency, or instrumentality that received federal funds—New York's Unified Court System. We hold that the district court erred in determining that the Unified Court System was the appropriate department, agency, or instrumentality under the Rehabilitation Act; instead, the relevant recipient of federal funding is the "Courts of Original Jurisdiction." Because the Board is not an operation of the "Courts of Original Jurisdiction," and because the Board does not otherwise receive any federal funding, it is immune from suit under Section 504. Accordingly, the judgment of the district court is reversed and we remand for further proceedings consistent with this opinion, including consideration of the Board's motion to dismiss as to T.W.'s remaining claim under Title II of the Americans with Disabilities Act.

| | |
|---|---|
| FOR PLAINTIFF-APPELLEE: | MICHAEL STEVEN STEIN (Mary Vargas, *on the brief*) Stein & Vargas, LLP, New York, NY; Jo Anne Simon, Jo Anne Simon, P.C., New York, NY. |
| FOR DEFENDANTS-APPELLANTS: | JOSHUA M. PARKER, Assistant Solicitor General of Counsel, Steven C. Wu, Deputy Solicitor General, and Barbara D. Underwood, Solicitor General *for* Letitia James, Attorney General for the State of New York, New York, NY. |

DEBRA ANN LIVINGSTON, *Chief Judge*:

T.W., a law school graduate, filed suit on June 10, 2016 in the Eastern District of New York against the New York Board of Law Examiners ("the Board" or "BOLE") asserting that the Board had violated Section 504 of the Rehabilitation

Act and Title II of the Americans with Disabilities Act ("ADA") by allegedly discriminating against her in denying appropriate disability accommodations for the bar examination. The Board filed a motion to dismiss, arguing, in part, that it was immune from suit under the Eleventh Amendment because it was neither a recipient of federal funding, nor an operation of a "department, agency, special purpose district, or other instrumentality of a State or of a local government" that received federal funding. 29 U.S.C. § 794(b). The district court denied the Board's motion to dismiss and subsequent motion for reconsideration concluding that, while the Board itself had not received federal funding, the Board was a "program or activity" of a "department, agency, . . . [or] instrumentality"—specifically, the Unified Court System ("UCS")—that had received funding.

We disagree. During the relevant period, from 2013 to 2015, the only entities within the New York judiciary to receive federal grant money were specialized courts, including drug treatment courts, family courts, domestic violence courts, and veterans treatment courts. These specialized courts are "part of" the "Courts of Original Jurisdiction," a separate part of the New York State court system for budgetary purposes. 29 U.S.C. § 794(b). We therefore conclude that the Courts of Original Jurisdiction, and not the *entire* state judiciary,

3

is the relevant "program or activity receiving Federal financial assistance." *Id.* § 794(a). As a result, the Board would be amenable to suit under Section 504 if it were an "operation[] of" the Courts of Original Jurisdiction during the relevant period. *Id.* § 794(b). Because it is not, and because the Board does not itself receive any federal financial assistance, we hold that the Board is immune from suit under the Rehabilitation Act and accordingly reverse.

## BACKGROUND

### I. Factual Background[2]

T.W. is a Harvard Law School graduate who suffers from depression, anxiety, and ongoing complications from a severe head injury. While at Harvard, she received testing accommodations for her disabilities, including fifty-percent extra time on exams, stop-clock breaks, and separate testing facilities. When she signed up for the July 2013 New York bar examination, she requested these same testing accommodations, informing the New York State Board of Law Examiners "that she had been diagnosed with four impairments recognized by the DSM IV:

---

[2] The factual background presented here is derived from allegations in the complaint which we accept as true in considering a motion to dismiss.

4

panic disorder without agoraphobia, cognitive disorder, reading disorder, and amnesic disorder."[3]   Joint App'x 33.

The Board initially denied her request for any accommodation, but after she appealed the decision, the Board partly granted her accommodation requests, providing off-the-clock breaks and seating her in a smaller room, albeit with others receiving similar accommodations.   T.W. did not pass the July 2013 bar exam. She alleges that she did not pass because "the Board did not grant her extra time or a separate room," and therefore she "could not complete large portions of the examination."   *Id.* at 36.   At the time T.W. received her results, she had started as a law clerk at a law firm, and she stated that "[f]ailing the bar examination was a major blow to [her] standing," that "[s]he no longer was seen as one of the 'star' young associates by the firm's partners," and that "just as her career was getting started, she was forced to schedule a significant period of leave time in order to study for the bar examination again, making it impossible for the firm to staff her on matters where she would have significant responsibility."   *Id.* at 37.

---

[3] The DSM IV refers to the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association.

T.W. signed up for the July 2014 exam and again requested the three accommodations that she had received at Harvard. This time, the Board granted her a different mix of accommodations—fifty percent extra time, seating in a room with others receiving similar accommodations, but no off-the-clock breaks. She again did not pass. As a matter of firm policy, her law firm terminated her from her job.

T.W. passed the bar examination on her third attempt in February 2015. "This time, the Board provided [her] with double time instead of 50 percent extra time," an accommodation she "repeatedly had requested in the alternative should the Board be unable to give her off-the-clock breaks along with 50 percent extra time." *Id.* at 38. The Board did not provide any stated reason for its change in accommodations. T.W. alleges that the Board's failure to provide her initially with the accommodations that she requested caused her to fail the bar exam twice and resulted in her inability to find employment comparable to the position she had held at her law firm. T.W. sued the Board, its chair, and members of the Board, alleging violations of the ADA, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law ("NYCHRL"), seeking declaratory, compensatory, and injunctive relief.

## II. Procedural History

In November 2016, the Board moved to dismiss T.W.'s complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), asserting, *inter alia*, that the district court lacked subject matter jurisdiction because Eleventh Amendment immunity barred T.W.'s ADA and Rehabilitation Act claims. In September 2017, the district court deferred ruling on the motion, permitting T.W. to conduct limited discovery into whether the Board had accepted federal funding during the relevant period. At the same time, T.W. "agreed to withdraw her claims under Title III of the ADA and the NYCHRL, and her individual capacity claims against the chair and members of the Board." Joint App'x 17. The only claims that remained were her allegations against the Board itself under Title II of the ADA and Section 504 of the Rehabilitation Act. On September 18, 2019, the district court denied the Board's motion to dismiss, holding that T.W.'s claims were not barred by sovereign immunity under the Eleventh Amendment.

In reaching its holding, the court first rejected T.W.'s argument that the Board had itself received federal funding during the relevant time period of 2013 to 2015. During this time, two state agencies—the New York State Commission for the Blind ("NYSCB") and the New York State Education Department's Adult

Career and Continuing Education Services-Vocational Rehabilitation ("ACCES-VR")—had received federal funding and used that money to reimburse bar examinees with certain disabilities for fees that they incurred in registering for the bar exam. To receive reimbursement, bar examinees would first pay the Board for their bar registration fees, and then would submit proof of payment to NYSCB or ACCES-VR for reimbursement, which the agencies would pay directly to the examinees.

T.W. argued that even though the Board did not *directly* receive federal funding, it was the "intended recipient of federal funds," Dist. Ct. Dkt. 83 at 21, because NYSCB and ACCES-VR had received federal funding for the express purpose of reimbursing bar exam fees. The district court rejected this argument, stating that to waive immunity under § 504 of the Rehabilitation Act, the Board had to actually *receive* federal funds. Here, the district court remarked, "the funds used to pay [bar examination] fees are not federal funds because the reimbursement policy is a closed loop between the funding agency and the applicant—the federal funds never make their way into the Board's bank accounts; they are paid, after the fact, to the candidates when they apply for reimbursement." Special App'x 7. Because the Board had not received—

8

directly or indirectly—any federal funds, it had not waived immunity under this reasoning.

The district court held, however, that the Board *had* waived its immunity pursuant to T.W.'s second argument, that the Board is "a 'program or activity' of a department or agency that itself accepts federal funds—in this case, New York's Unified Court System." *Id.* at 8. The court determined that "[u]nder state law, the Board is both administered and funded as part of New York's judicial branch, UCS." *Id.* at 12. Because UCS "voluntarily and knowingly chooses to accept federal funds for some of its programs," UCS had "waived its Eleventh Amendment immunity for 'all of [its] operations,' including the Board." *Id.*

Having found that T.W. could proceed on her claim under Section 504 of the Rehabilitation Act, the district court declined to reach the Board's argument that T.W.'s Title II ADA claim should be dismissed. *See id.* at 4 ("Because the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act, Plaintiff need only prevail on one of these two claims to survive Defendant's motion to dismiss."). This appeal followed, challenging the district court's holding that the Board is not entitled to immunity.

## DISCUSSION

The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State[.]" U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State," the Supreme Court has "extended the Amendment's applicability to suits by citizens against their own States," as "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). The Board of Law Examiners, as an "'arm[]'" of the State of New York, "share[s] in that immunity," *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 US. 139, 144 (1993).

Eleventh Amendment immunity is "not absolute." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 108 (2d Cir. 2001). "When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court." *Id.* at 113. Congress did so when it enacted Section 504 of the

10

Rehabilitation Act. *See* 42 U.S.C. § 2000d-7 ("A state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of section 504 of the Rehabilitation Act of 1973[.]"). Section 504, in turn, provides:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

Immunity waiver under Section 504 of the Rehabilitation Act, however, is not without limit. Section 504, which proscribes discrimination against persons with disabilities, only abrogates the immunity of "any program or activity *receiving* Federal financial assistance." *Id.* (emphasis added). "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). A State and its arms can therefore "avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others." *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000) (*en banc*).

Even so, Congress made clear in the Civil Rights Restoration Act of 1987 that immunity waiver under § 504 is intended to be expansive. *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, sec. 4, 102 Stat. 28, 29 (1988) (codified at 29 U.S.C. § 794) ("1988 Amendments"). Under the amended Rehabilitation Act, Congress defined "program or activity" to mean "*all* of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . *any part of which* is extended Federal financial assistance." 29 U.S.C. § 794(b) (emphasis added). Moreover, the 1988 Amendments further expanded the definition of "program or activity . . . to include not only a state or local entity *originally* receiving [federal] assistance, but also each department or agency to which [the recipient entity] 'extend[s]' that assistance." *Bartlett v. N.Y. State Bd. of L. Exam'rs*, 156 F.3d 321, 330 (2d Cir. 1988) (emphasis added) (quoting 29 U.S.C. § 794(b)(1)(B)); *see also id.* ("[R]egulations promulgated under the Rehabilitation Act define a 'recipient' as including 'any instrumentality of a state . . . to which Federal financial assistance is extended directly *or through another recipient*." (quoting 45 C.F.R. § 84.3(f))).

There are thus three ways by which a State entity may waive its immunity to suit under Section 504. First, the entity may *directly* request and receive federal

12

financial assistance that is conditioned on Section 504 coverage. Second, the entity may be a "program or activity" of a "department, agency, special purpose district, or other instrumentality of a State or of a local government," "any part of which" receives federal aid. 29 U.S.C. § 794(b). And finally, the entity may *indirectly* receive federal financial assistance through *another* entity that requests and receives the Federal financial assistance in the first instance and then *extends* that money to the non-requesting entity.

We are therefore tasked with reviewing whether, under any of these three paths, the Board has waived its immunity to suit under the Rehabilitation Act. In doing so, the Court "review[s] the district court's factual findings for clear error and its legal conclusions *de novo*." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015). The Board, as the party asserting immunity, "bear[s] the burden of demonstrating entitlement." *Id.*

At the outset, both parties agree that the Board did not *directly* or *indirectly* receive any financial assistance from the federal government between 2013 and 2015. Instead, T.W. argues that the Board has waived its immunity because it "remains *the intended recipient* of the federal assistance" that two state agencies— NYSCB and ACCES-VR—receive. Appellee Br. 51 (emphasis added).

13

Alternatively, T.W. asserts, as the district court held, that the Board has waived its immunity because it is a "program or activity" of a State department, agency, or instrumentality that receives federal funding. We conclude that neither argument is persuasive, and that the Board has demonstrated its entitlement to immunity. Accordingly, we hold that the Board is immune from suit under § 504 of the Rehabilitation Act.

## I.

We turn first to T.W.'s argument that the Board waived immunity because it was the *intended* recipient of federal assistance used by NYSCB and ACCES-VR to reimburse bar examinees. The district court concluded that this argument was unavailing. We agree.

Prior to 2011, the Board indirectly received federal funding from two agencies, the New York State Department of Education, Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") and the New York State Department of Social Services, Commission for the Blind and Visually Handicapped ("CBVH"). These agencies received federal funds and then used those funds to "issue vouchers for handicapped bar applicants to pay for the bar examination." *Bartlett*, 156 F.3d at 330. When bar candidates enrolled for the

bar exam, they provided the "voucher" as their form of payment for the exam. The Board, in turn, would send an invoice to VESID or CBVH, asking them to submit payment to the Board on behalf of the examinee.

During the time that the Board accepted voucher payments, it was sued for violating the ADA and the Rehabilitation Act. The plaintiff argued, and this Court agreed, that the Board had waived its immunity to suit under the Rehabilitation Act because "the Board [was] a recipient of federal funds within the meaning of § 504." *Id.* We held that because two agencies had received federal funds and then extended that funding to the Board to pay the fees of eligible bar examinees, the Board was an indirect recipient of federal funding and had therefore waived its immunity to suit.

After 2011, BOLE changed its policy so that candidates could only pay bar examination fees directly. Vouchers were no longer accepted as a method of payment. To work with this new system, NYSCB and ACCES-VR, in addition to the Department of Veterans Affairs, used federal funds to directly reimburse eligible bar candidates for exam fees. Bar examinees eligible for funding now pay the examination fees out of their own pockets to the Board initially, and then request reimbursement from one of these entities.

15

No money from NYSCB, ACCES-VR, or the Department of Veterans Affairs ever gets paid to the Board; the money gets paid directly to the candidate *after* she has paid her examination fees. Because the Board does not receive federal funds directly or indirectly, this Court's holding in *Bartlett* no longer applies. T.W. asserts, however, that § 504 can waive immunity for a state entity that is the *intended* beneficiary of federal funding, even if it never actually receives that assistance. No case supports this conclusion.

As we emphasized in *Bartlett*, § 504 applies only to entities that *receive* federal funds. The rationale is that entities that receive federal funds are "in a position to accept or reject" corresponding "obligations" under the Rehabilitation Act "as a part of the decision whether or not to 'receive' federal funds." *Bartlett*, 156 F.3d at 330 (emphasis and internal quotation marks omitted). As the district court rightly commented, were we to accept T.W.'s suggested rule, "the only way [the Board] could protect its sovereign immunity would be to prevent anyone potentially eligible for a federal funded reimbursement from taking the bar exam—an absurd result." Special App'x 8.

The Board is, at most, an indirect beneficiary of the federal funding that NYSCB and ACCES-VR receive, but this alone does not waive the Board's

16

immunity. As the Supreme Court has repeatedly affirmed, if a State entity merely obtains "indirect economic benefits" from federal funding but does not actually *receive* federal funding, it has not waived immunity. *Paralyzed Veterans of Am.*, 477 U.S. at 607; *see id.* ("The statute covers those who receive the aid, but does not extend as far as those who benefit from it."); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999) (noting that Title IX, like the Rehabilitation Act, waives immunity only for "[e]ntities that receive federal assistance, whether directly or through an intermediary," and not for "entities that only benefit economically from federal assistance"). In *Paralyzed Veterans of America*, for example, the Court stated that although airlines benefitted from federal assistance that was extended to airport operators by virtue of the operators' use of federal funding to improve airport runways, "[n]ot a single penny of the money [was] given to airlines," and "[t]hus, the recipient for purposes of § 504 [was] the *operator* of the airport and not its users." 477 U.S. at 605. While the Board may benefit in some sense from bar examinees' ability to seek reimbursement from NYSCB, ACCES-VR, and the Department of Veterans Affairs, it is not the recipient of federal funds, and thus has not waived its immunity in this regard.

## II

We turn then to a more difficult issue: whether the Board is an "operation[]" of . . . a department, agency, . . . or other instrumentality" that receives federal funding. 29 U.S.C. § 794(b)(1)(A). The district court held that the New York Unified Court System is a "department, agency, . . . or other instrumentality" that receives federal funding, and that the Board, as a "program or activity" of UCS, has waived immunity. Special App'x 8. We conclude that the district court erred in treating UCS as the relevant department, agency, or instrumentality and instead hold that the relevant recipient is the "Courts of Original Jurisdiction."

In determining the scope of waiver under § 504 we undertake a three-part analysis. We first identify which entity within UCS receives federal funding. We then determine whether that entity is a "part of" a broader "department, agency . . . or other instrumentality." If so, that entire department and "*all* of [its] operations" have waived immunity under § 504. *See generally* 29 U.S.C. § 794(b) (extending § 504's requirements to all "operations of . . . a department, agency, . . . or other instrumentality of a State or of a local government . . . *any part of which* is extended Federal financial assistance" (emphasis added)). Finally, we examine

18

whether the Board is an operation of that recipient department, agency, or instrumentality.   If it is not, then the Board is immune from suit.

### i.       Recipients of Federal Grant Money in the Unified Court System

The Unified Court System, or "UCS," is the name for the entire New York State judiciary, organized in 1978 after the New York Legislature passed "a constitutional amendment which . . . ordained a fully centralized system of court management."   Joint App'x 274; *see also* N.Y. Const. Art. VI, sec. 1(a).   Under the umbrella of the UCS are the trial courts (the "Courts of Original Jurisdiction"), the appeals courts (the "Appellate Divisions"), and New York's highest court, the Court of Appeals.

Shortly before consolidating the entire judiciary into the Unified Court System, the New York Legislature passed the Unified Court Budget Act, which "provides for full State financing of New York's court system, except for its town and village courts."   Joint App'x 273.   Under this Act, the entire court system prepares and completes a single budget, and then presents it to the New York Legislature.   Further, the Legislature decided under New York Judiciary Law § 212(n) to centralize the manner by which any component part of UCS can receive federal funding, appointing the "chief administrator of the courts" ("Chief

19

Administrator") as the sole individual authorized to accept federal grants on behalf of any part of UCS. N.Y. Jud. Law § 212(1)(n). The Chief Administrator is also the "[p]rincipal management authority" of UCS, Joint App'x 274, meaning that he or she "supervise[s] the administration and operation of the unified court system," N.Y. Jud. Law § 212(1). According to UCS's Judiciary Budget, however, the Chief Administrator is "responsible for supervising the day to day administration and operation of the *trial courts*. The Appellate Divisions and the Court of Appeals are responsible for the administration and operation of their own courts." Joint App'x 305 (emphasis added); *see also id.* at 309 (chart of UCS's administrative structure reflecting that the Chief Administrator does not oversee the Court of Appeals or the appellate courts).

From 2013 to 2015, the annual UCS budgets show that all federal funding to the UCS was allocated *exclusively* to the Courts of Original Jurisdiction, not to the Court of Appeals or the Appellate Divisions. The grant money is used within the Courts of Original Jurisdiction to fund services in the drug treatment courts, family courts, and other specialty courts. *See, e.g.*, Joint App'x 107 (noting a

20

federal grant from the Department of Health and Human Services "to improve permanency in family court cases").

Mary Witting and Frank Woods, UCS's Rule 30(b)(6) designees, explained how these courts actually receive federal grant money. When a drug court, for example, wants to request a federal grant, "the individual drug court will apply for the grant," and will "then . . . get a contract with the federal government [that] they have to abide by," including reporting and spending requirements. Joint App'x 106; *see also id.* (noting that the requesting court "ha[s] to submit time sheets and expenditure reports . . . quarterly"). The requesting court will then "spend in the first instance" from "funding [put] in the budget for anticipated federal grants," and then "get reimbursed by the federal government" for that spending. *Id.* When the grant money is actually provided by the federal government, the *Chief Administrator* is "the signatory and authorized recipient[.]" *Id.* at 127. The money is then "coded" into the appropriate "bucket" in the overall UCS budget. *Id.* at 93, 100; *see also id.* at 95 ("It would go into the federal funds bucket[.]"). That

21

"bucket" appears in the annual UCS budget as a component of the Courts of Original Jurisdiction's budget.

The first issue before us then is whether the Chief Administrator—who "accepts" funds that are applied for, requested, and used by lower courts within the Courts of Original Jurisdiction—is the "recipient" of federal funds for purposes of the Rehabilitation Act, or if the requesting lower courts are the "recipients." We conclude that these lower courts are the proper "recipients" of federal aid.

We are guided by the persuasive reasoning of our sister circuit. In *Singer v. Harris*, the Eighth Circuit addressed whether the Arkansas State Treasurer had waived immunity under the Rehabilitation Act by virtue of his acceptance of federal funds on behalf of other state agencies. 897 F.3d 970, 976–77 (8th Cir. 2018). In Arkansas, the Treasurer is the only entity authorized to receive and distribute federal funds that are requested by and directed to other state agencies. *Id.* at 975 (citing Ark. Code Ann. § 25-16-604). The Eighth Circuit held that the Treasurer had not waived its immunity under Section 504 because:

> The State Treasurer's Office does not accept federal assistance for itself. . . . [T]he Treasurer does not make use of federal funds. Rather, it holds the funds for other agencies in Arkansas that have accepted federal assistance. Holding the funds for other agencies

22

does not qualify as 'receiving Federal financial assistance' under the statute.

*Id.* at 976.   The court continued:

> We find that . . . the word "distribute" under the Rehabilitation Act means accepting and allocating federal funds for the department's own use, not simply dispersing federal funds to departments that have accepted federal financial assistance. . . . [T]he Treasurer is simply doing what he is bound to do by state law, dispersing federal funds to the agencies that have elected to receive federal assistance. Therefore, because the Treasurer neither accepted nor distributed federal financial assistance, he is not subject to the Rehabilitation Act.

*Id.* (citation omitted)

There are many parallels between the Arkansas State Treasurer and the Chief Administrator of UCS.   The Chief Administrator, like the Treasurer, is "simply doing what he is bound to do by state law" when he or she accepts federal funds on behalf of requesting UCS entities.   The Chief Administrator "does not make use of federal funds" but merely "holds" them for the requesting agency. *See* Joint App'x 107 ("The funds that come from these grants are restricted to the purpose of [the] grant").   The Chief Administrator does not "mak[e] decisions about which agencies or which subunits within certain agencies are going to receive federal funds and in what amount." *Singer*, 897 F.3d at 976.   In many ways, the Chief Administrator is like a centralized bank to which federal agencies

23

deposit grant money for UCS entities. Beyond that, the Chief Administrator has no actual tie to or use of the grant money.

Moreover, when the specialty courts apply for grant money to implement certain programs, the grant money they receive can only be "used for the terms and specified purposes to which the grant was offered[.]" Joint App'x 131. In carrying out those purposes, the specialty courts are "required to meet certain federal requirements," *Jim C.*, 235 F.3d at 1082. It is in this sense—that the specialty court receives grant money in exchange for certain promises—that the specialty courts are the true recipients of funding under the Rehabilitation Act. That the New York Constitution has created a streamlined approach for how that funding is processed, *i.e.*, through the Chief Administrator, does not, under the facts presented here, impact our determination that the true recipients of federal funding are the requesting courts and not the Chief Administrator.

ii.     **Department, Agency, or Instrumentality**

That leaves us to examine whether these courts belong to any department, agency, or instrumentality within UCS. The district court held that the entire Unified Court System itself is the relevant department or agency. We disagree.

24

There is no precedent in this Circuit that defines a department, agency, or instrumentality under the Rehabilitation Act, and even outside of this Circuit "[s]urprisingly, little precedent addresses the issue." *Brewer v. Wis. Bd. of Bar Exam'rs*, No. 04-C-0694, 2006 WL 752922, at *4 (E.D. Wis. Mar. 22, 2006), *aff'd*, 270 F. App'x 418 (7th Cir. 2008). What precedent does exist, however, cautions against the conclusion that UCS is the relevant department, agency, or instrumentality, such that the receipt of federal grant money by the drug, family, and other specialty courts would render the entire New York judiciary amenable to suit under Section 504.

At the start, we are mindful of two competing considerations in determining the relevant department, agency, or instrumentality. On one hand, Congress amended the Rehabilitation Act in 1988 to broaden the definition of "program or activity" after the Supreme Court narrowly interpreted it in *Grove City Coll. v. Bell*, 465 U.S. 555, 573 (1984) (holding that the receipt of federal grants by some college students only waived immunity for the college's financial aid program and not the college as a whole); *see also Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635–36 (1984) (extending the holding of *Grove City College* from Title XI to the Rehabilitation Act). Congress intended the Rehabilitation Act to have broad reach, amending the

25

statute to "make clear that discrimination is prohibited throughout *entire* agencies or institutions if any part receives Federal financial assistance." S. Rep. 100-64, at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3, 64 (emphasis added). On the other hand, immunity waiver under Section 504 is not without limit, *see Garcia*, 280 F.3d at 113 n.2 (noting that "§ 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted"), and "in assessing whether a state has made a knowing and intentional waiver, the Supreme Court has instructed that 'every reasonable presumption against waiver' is to be indulged." *Id.* at 114 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999)).

Keeping these competing principles in mind, the Seventh Circuit has remarked that while immunity should not be construed narrowly under the Rehabilitation Act, the Act "was not, so far as we are able to determine . . . intended to sweep in the whole state or local government[.]" *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991). With this same understanding, we conclude that the entire judiciary is not subject to the Rehabilitation Act because several specialty courts receive financial aid. Instead, we hold that the lower courts are not a

"program or activity" of the UCS for purposes of the Rehabilitation Act but are instead a "program or activity" of the Courts of Original Jurisdiction.

Our starting point is the text of the Rehabilitation Act, that a "'program or activity' means all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b). Notably, this list does not include the word "branch." And UCS, New York's entire judicial branch, is not a "department" or an "agency," which are best understood as "units of a governmental entity." *Edison v. Douberly*, 604 F.3d 1307, 1309 (11th Cir. 2010); *cf. Trump v. Deutsche Bank AG*, 943 F.3d 627, 641 (2d Cir. 2019) (noting that "[c]ontemporary dictionaries" support defining "department . . . to mean some *component part* of the Executive Branch") (emphasis added and internal quotation marks omitted)). Under the canon of *noscitur a sociis*, moreover, "we consider the context in which a particular word occurs because a statutory term 'gathers meaning from the words around it.'" *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying word,

27

thus giving unintended breadth to the Acts of Congress." (internal quotation marks omitted)). This canon suggests that "instrumentality" does *not* mean an entire branch of government because "[t]he 'company' which 'instrumentality' keeps . . . include[s] the words 'department, agency, and special purpose district.' . . . Agencies and departments are *units* of a governmental entity. A special purpose district . . . is set up to *serve* the special needs of a *governmental entity*, such as water conservation." *Edison*, 604 F.3d at 1309 (emphases added). To read "instrumentality" to mean a "branch of government" would thus define the word much more broadly than its statutory neighbors, which all seem to best describe subunits of a government branch. *See, e.g., McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'nrs*, 650 F. App'x 703, 706 (11th Cir. 2016) ("[T]he ordinary meaning of these terms cannot be construed to mean the County as a whole . . . . The relevant unit is 'a department, agency, special purpose district or other instrumentality' of the County, such as the Fire Rescue Department.").

This reading is confirmed by consideration of the text of the Rehabilitation Act as a whole. Other provisions of the Rehabilitation Act contain explicit references to branches of government. *See, e.g.*, 29 U.S.C. § 794c(b)(1) (referring to "the various departments, agencies, *and branches* of the Federal Government

28

responsible for the implementation and enforcement of the provisions of this subchapter" (emphasis added)).   It is therefore clear from the statute itself that when Congress *intends* to refer to an entire branch of government, "it knows how to do so."   *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003).   Furthermore, in yet other provisions, the Rehabilitation Act expressly refers to "instrumentality" as a subunit of a governmental branch.   *See* 29 U.S.C. § 791(a) ("It shall be the purpose and function of the Committee (1) to provide a focus for Federal and other employment of individuals with disabilities . . . by each department, agency, and *instrumentality in the executive branch* of Government[.]") (emphasis added)).   Under "the normal rule of statutory interpretation . . . identical words used in different parts of the same statute are generally presumed to have the same meaning."   *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).[4]   Finally, to the extent that any ambiguity remains, the Supreme Court's instruction that Eleventh Amendment waiver must be "knowing and intentional" and that "every

---

[4] We are further mindful that New York intentionally created a unified judiciary and budget system to organize "administrative control in a central authority" in order to more efficiently provide "timely and inexpensive justice."   Joint App'x 274, 276.   We are particularly hesitant to reach a conclusion that would require a state to amend its own constitution in order to restructure its unified court system to avoid branch-wide waivers of immunity under a federal statute.

reasonable presumption against waiver is to be indulged" further supports the conclusion that no such waiver occurred as to the UCS as a whole. *Garcia*, 280 F.3d at 114 (internal quotation marks omitted).

Next, in "consider[ing] whether a particular subunit of state government is an independent department under the Rehabilitation Act," courts "look to the state's characterization of the subunit under state law." *Arbogast v. Kan. Dep't of Lab.*, 789 F.3d 1174, 1184 (10th Cir. 2015); *see also Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 201 (3d Cir. 2008) ("Although the Rehabilitation Act is a federal statute, we look to state law to ascertain the character of a state entity for purposes of assessing Eleventh Amendment immunity."). In so doing, courts typically focus on how, under state law, the "program or activity" is budgeted for and administered. *See, e.g.*, *Sharer v. Oregon*, 581 F.3d 1176, 1178, 1180 (9th Cir. 2009) (rejecting Plaintiff's argument that Oregon's Office of Public Defense Services is a department of "a uniform 'judicial department'" because it has a "distinct funding source[] and administrative apparatus[]."); *Hobbs v. Fla. Bd. of Bar Exam'rs*, No. 4:17-cv-422-RH/CAS, 2018 WL 5905467, at *5 (N.D. Fla. June 16, 2018) ("Units that share a budget are more likely to be part of the same department. . . . On the other hand, a unit that has its own separate budget or its own ranking

30

officer or governing board is more likely to be a stand-alone department, not part of the same department as another unit. Units with similar functions are more likely . . . to be part of the same department.").

We thus look to New York's characterization of the courts that receive federal funds to determine whether they constitute an independent department, agency, or instrumentality within the UCS or if they belong to another department. In doing so, we conclude that UCS is comprised of at least three subunits: the Court of Appeals, the Appellate Divisions, and the Courts of Original Jurisdiction. Each component has its own separate operating budgets, and each is required to compile its own individual budget, which is then forwarded to the Division of Financial Management at UCS in August or early September. The day-to-day administration of the Courts of Original Jurisdiction, Appellate Divisions, and Court of Appeals is also managed separately. The Courts of Original Jurisdiction are overseen by the Chief Administrator while the Appellate Divisions and Court of Appeals are separately responsible for their own administration and operation. With separate operating budgets (even if these budgets are ultimately presented

31

together in a unified budget to the Legislature), administration, and roles within the judiciary, these three units are best viewed as separate departments.

The annual UCS budgets show that all federal funding accepted between 2013 and 2015 was allocated exclusively to the Courts of Original Jurisdiction. The budget further explains that the "Courts of Original Jurisdiction" Joint App'x 302, are comprised of the Supreme and county courts, family courts, surrogate's courts, community courts, drug treatment courts, and New York City Housing Court, among other entities. The budget thus reflects that each of the courts to receive federal funding is considered part of the Courts of Original Jurisdiction, and that all subunits of the Courts of Original Jurisdiction are therefore deemed to have waived immunity.

In deciding that the Courts of Original Jurisdiction, and not the entire UCS, is the relevant "unit[]" for immunity waiver under the Rehabilitation Act, *Edison*, 604 F.3d 1309, we join other courts in declining to hold that a judicial subunit's receipt of federal funds waives the immunity of a state's whole judiciary. In *Haybarger*, for example, the Third Circuit was tasked with determining whether the Lawrence County Adult Probation and Parole Department ("LCAPPD") was a "program or activity" of a department that received federal funding, such that it

32

lacked immunity. 551 F.3d at 200–01. The LCAPPD is part of the "Fifty-Third Judicial District" in Pennsylvania, but like New York, "the Pennsylvania Constitution vests judicial power in a 'unified judicial system' which includes all of Pennsylvania's courts," called the UJS. *Id.* at 196, 201. The Third Circuit determined that the relevant "department" was the "Fifty-Third Judicial District," of which the LCAPPD was a subunit, and examined only whether that judicial district had accepted federal funding such that it had waived the immunity of the LCAPPD—rather than the Pennsylvania UJS as a whole. *Id.* at 202; *see also Hobbs*, 2018 WL 5905467, at *6 (rejecting claim that the "entire Florida court system is a single department within the meaning of the Rehabilitation Act," determining that Florida's Board of Law Examiners was part of the State's Supreme Court, and so holding that Florida lower courts' receipt of federal funds did not waive the Board's immunity); *Maat v. County of Ottawa*, No. 1:12-cv-1194, 2014 WL 1255981, at *7 (W.D. Mich. Mar. 26, 2014), *aff'd*, 657 F. App'x 404 (6th Cir. 2016) (rejecting Plaintiff's argument "that because the [State Court Administrative Office] receives federal financial assistance, the entire state court system should be covered in all its operations"); *Brewer*, 2006 WL 752922, at *4 ("If mere control of one entity by another were enough to render both entities part of the same department, agency,

33

or instrumentality, . . . receipt of federal funds by any executive agency would subject the entire executive branch of a state or locality to the Rehabilitation Act. . . . The court can see no reason why a different rule should apply to the judicial branch than to the executive branch.").

These cases and others suggest that while "[t]here is no bright-line test for determining what constitutes a department," *Hobbs*, 2018 WL 5905467, at *5, the entire judicial system is *not* generally a "department, agency, special purpose district, or other instrumentality" for Section 504 purposes. Instead, here, the Courts of Original Jurisdiction is the appropriate unit.

For these reasons, we are persuaded that the department to have waived immunity is the Courts of Original Jurisdiction, and any "program or activity" that falls under it. In setting the relevant department as the Courts of Original Jurisdiction, as opposed to limiting it more narrowly to the specific courts that receive the federal funds, we respect Congress's intent of expansive waiver under the Rehabilitation Act, while simultaneously respecting that State entities should be able to knowingly waive immunity by "accepting federal funds for some departments and declining them for others." *Jim C.*, 235 F.3d at 1081. With the relevant department established, then, we can now examine whether the Board

34

should be deemed to have waived its immunity, by determining whether the Board is an operation of the Courts of Original Jurisdiction.

### iii.     The Board

The precise location of the Board of Law Examiners within the Unified Court System is contested by the parties.    There is no dispute that the Board is part of the Unified Court System.    *See Pasik v. State Bd. of L. Exam'rs* (*In re Pasik*), 102 A.D.2d 395, 400, 478 N.Y.S.2d 270, 273 (1st Dep't 1984).    The parties dispute, however, whether the Board is an "operation" of *any* "department, agency, . . . or other instrumentality" within UCS, or if it functions independently.    Although the Board is likely an operation of the Court of Appeals, *see In re Pasik*, 102 A.D.2d at 400, 478 N.Y.S.2d at 273; *Baccus v. Karger*, 692 F. Supp. 290, 291 (S.D.N.Y. 1988), we need only examine whether the Board is an "operation" of the Courts of Original Jurisdiction for purposes of this appeal.

We conclude that the Board is certainly not an operation of the trial courts. The Courts of Original Jurisdiction and the Board are funded by separate appropriations, the money that the Board receives in fees from bar examinees is not distributed in any way to the trial courts, and there is no law providing for any oversight or connection between the Board and any trial court.    Neither entity is

35

"'linked . . . by virtue of their status under [New York] law,'" and each has "distinct funding sources and administration." *Sharer*, 581 F.3d at 1180 (quoting *Haybarger*, 551 F.3d at 202). Only the Court of Appeals, and not the Courts of Original Jurisdiction, bears "responsibility and authority for promulgating rules and standards governing eligibility for admission to the State bar." *Baccus*, 692 F. Supp. at 291 (citing N.Y. Jud. Law § 53). Absent any connection, other than that both entities are under the UCS umbrella, the Board is not a "program or activity" of the Courts of Original Jurisdiction, the only department that receives federal funding. The Board, then, has not waived its immunity under the Rehabilitation Act, and is therefore not amenable to suit.

*    *    *

The Rehabilitation Act provides protections for persons with disabilities, and the Board of Law Examiners makes important disability accommodation decisions for each administration of the bar examination. But "[s]tate sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected," *Coll. Sav. Bank*, 527 U.S. at 682, and absent a finding of waiver of that

right not present on the facts before us, we conclude that the Board may not be sued under the Rehabilitation Act.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion, including consideration of the Board's motion to dismiss as to T.W.'s remaining Title II claim under the ADA.